Mark William CANTER and Walter Edwin Moore, Plaintiffs,

v.

John HARDY, Frederick LaBarge, Douglas Wilt, Kenneth Bur, Carl Goeman, Charles Rettstadt, Research North, Inc., and Debra Parmentier, Defendants.

Nos. 97–CV–76290–DT, 97–CV–76291–DT.

United States District Court, E.D. Michigan, Southern Division.

March 6, 2002.

Ray J. MacNeil, Gaylord, MI, for Plaintiffs.

Christopher Johnson, Farmington Hills, MI, for Otsego County.

Gregory Thomas, Southfield, MI, for Rettstadt & Research.

Mark S. Meadows, Asst. Atty. Gen., Lansing, MI, for Goeman Hardy, LaBarge Wilt and Bur.

*OPINION AND ORDER REGARDING STATE POLICE AND RESEARCH NORTH, INC. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. *INTRODUCTION*

The above-captioned Section 1983 action is presently before the Court on two Motions for Summary Judgment filed by Defendants John Hardy, Frederick LaBarge, Douglas Wilt, Kenneth Bur and Carl Goeman (the "State Police Defendants") and Defendants Charles Rettstadt and Research North, Inc. (the "Research North Defendants"). Plaintiffs have responded to Defendants' Motions to which Responses Defendants have replied. The Court has reviewed and considered the parties respective briefs and supporting documents, and having heard the oral arguments of counsel on November 30, 2001, the Court now issues this written Opinion and Order setting forth its ruling.

## II. *PROCEDURAL HISTORY*

Plaintiffs William Moore and Mark Canter ("Plaintiffs") were separately tried and convicted of second degree murder in 1988 in Otsego County Circuit Court for the murder of oil field worker Jerry Tobias.[1] Both Moore and Canter appealed their convictions to the Michigan Court of Appeals. While their appeals were pending, at the request of Canter's counsel, the

Michigan Attorney General commenced an investigation into Canter's conviction in December 1989. This investigation revealed extensive irregularities in the prosecution's handling of both Canter's and Moore's cases.

In light of the Attorney General's findings, both men sought new trials and the Court of Appeals ultimately remanded their cases to the trial court for evidentiary hearings on the allegations of prosecutorial irregularities and consideration of their new trial requests.

Following remand, the Otsego County prosecutor's office turned over to the defense for the first time thousands of pages of documents relating to the investigation of Jerry Tobias's murder. Many of these documents contained exculpatory information relating to Plaintiffs, notwithstanding the county prosecutor's testimony before the Otsego County Circuit Court in the remand/new trial proceedings that all such information had been disclosed prior to trial. In addition, one of the prosecution's key witnesses, Debra Parmentier, was charged in 1994 with eight counts of perjury for false statements she allegedly made during Plaintiffs' murder trials. Then, in February 1995, Parmentier gave a lengthy unsworn, tape-recorded statement to Canter's counsel indicating that her testimony implicating Plaintiffs had been false.

On January 16, 1996, the state trial court advised counsel that it would grant Plaintiffs' motions for a new trial, and on January 18, 1996, Plaintiffs were released from prison. They had served more than

---

1. Also charged with Tobias' murder were Plaintiff Walter Moore's brother, Laurie Moore, Doug Brinkman and Donald Heistand. Laurie Moore was convicted by a jury of voluntary manslaughter in November 1987, a year prior to Plaintiffs' trials. His conviction was subsequently reversed by the Michigan Court of Appeals in May 1991 because of

instructional error, *see People v. Laurie Moore,* 189 Mich.App. 315, 472 N.W.2d 1 (1991), and the charges against him were not reinstituted. Donald Heistand pleaded nolo contendere and Doug Brinkman pleaded guilty to charges of being accessories after the fact to murder. *See People v. Mark Canter,* 197 Mich.App. 550, 552 n. 1, 496 N.W.2d 336, 338 n. 1 (1992).

seven years in prison at the time of their release.

The county prosecutor thereafter decided to recharge Canter and Moore with murder, and filed new criminal charges against them on May 24, 1996. The trial court, however, ruled that Parmentier's previous testimony against Plaintiffs would not be admitted at their new trial. Consequently, the trial court dismissed the new charges against Plaintiffs for lack of probable cause.

Plaintiffs subsequently filed the instant civil rights actions in this Court on September 5, 1997, alleging various constitutional violations stemming from the state's prosecution of them for the murder of Jerry Tobias. In their separately-filed, but identical, 135–page, eleven-count Complaints, Moore and Canter named 13 individuals and entities as defendants: Norman Hayes, Prosecuting Attorney for Otsego County; Kevin Hesselink, former Assistant Otsego County Prosecuting Attorney and Hayes' successor as County Prosecutor; Dawn Schumacher, Assistant Otsego County Prosecuting Attorney; Jerry Boerema, investigator with the office of the Otsego County Prosecuting Attorney; Patricia Newhouse, Assistant Otsego County Medical Examiner; and Otsego County (collectively referred to herein as the "County Defendants"); Frederick LaBarge, a Michigan State Police Detective Sergeant; John Hardy, a Michigan State Police Detective Lieutenant; Douglas Wilt, a Michigan State Police Detective Sergeant; Kenneth Bur, a Michigan State Police Trooper; and Carl Goeman, a Michigan State Police Lieutenant (collectively the "State Police Defendants"); Charles Rettstadt, a private investigator and sole owner of Research North, Inc. (the "RNI Defendants"); and Brieanna Herrick, a/k/a Debra Parmentier.[2]

The County and State Police Defendants subsequently filed separate motions for summary judgment. These motions were referred to Magistrate Judge Komives for Report and Recommendation. On September 30, 1999, this Court issued an Opinion and Order adopting the Magistrate Judge's comprehensive R & R with certain modifications, the substance of which was affirmed by the Sixth Circuit Court of Appeals. *See Canter v. County of Otsego, et al.*, 14 Fed.Appx. 518, 2001 WL 814937 (6th Cir.2001) (unpublished decision; text available on WESTLAW). This resulted in the dismissal of a number of Plaintiffs' claims. Then, on November 2, 2001, a settlement was entered into between the Plaintiffs and the County Defendants and on November 7, 2001, all claims against the County Defendants were dismissed.

Consequently, only Plaintiffs' Section 1983 claims for malicious prosecution against State Police Defendants Hardy and LaBarge in Count I and against Defendant Goeman in Count II; their claim of denial of fair trial/due process based on subornation or perjury, intimidation of witnesses and destruction of evidence in Count VI against all of the State Police Defendants; and their Section 1983 conspiracy claim against the State Police Defendants, the RNI Defendants, and Debra Parmentier in Count VIII remain for adjudication.

Discovery has now closed and the State Police Defendants and the RNI Defen-

---

**2.** Debra Parmentier disappeared shortly after she gave her statement to Plaintiff's counsel in 1995. To date, Defendant Parmentier has not been located and, consequently, was served with process in this matter "by publi- cation." She has never appeared in this matter nor has anyone appeared on her behalf. However, Plaintiffs have never obtained nor have they ever sought entry of default against her.

dants now seek entry of summary judgment in their favor on Plaintiffs' claims against them in this action. Specifically, the State Police Defendants renew their previously filed motion for summary judgment favor contending that Plaintiffs are unable to make a factual showing sufficient to establish the constitutional violations they complain of against them. The RNI Defendants contend that they are not "state actors" and therefore cannot be held liable to Plaintiffs under Section 1983. They further argue that there is no evidence supporting Plaintiffs' theory that they conspired with others to deprive Plaintiffs of their constitutional rights.

### III. *FACTUAL BACKGROUND*

As indicated, these consolidated cases arise from the prosecution of Plaintiffs Mark Canter and Walter ("Terry") Moore for the December 1986 murder of Jerry Tobias in Otsego County, Michigan. Plaintiffs' suit against the State Police Defendants is predicated upon the involvement of these defendants in the murder investigation and subsequent prosecution of Canter and Moore.

On December 8, 1986, the body of Jerry Tobias, an oil field worker, was discovered in the City of Gaylord, in the bed of his pickup truck. At the time his frozen body was discovered, Tobias's hands were tied with jumper cables, his shirt was torn and bloodstained, and there was blood over the right temple, behind the right ear, on the top of the head, and over the left ear. *See People v. (Laurie) Moore*, 189 Mich.App. 315, 316, 472 N.W.2d 1, 2 (1991) (per curiam). An autopsy was performed on the following day, and the date of death was fixed as December 5, 1986. *See* Compl., ¶ 21.

In early January of 1987, Defendant Debra Parmentier told her husband, Leonard Parmentier, and Bernard J. Casper, an attorney, that she had witnessed the Tobias murder. She indicated that Tobias had been stabbed. Casper related this information to Otsego County Prosecutor Norman Hayes, and Leonard passed on the information to Jerry Boerema, an investigator attached to the Otsego County Prosecutor's office. *See* Att. # 68; # 126, at 151; # 178, at 72; # 180.[3] On March 2, 1987, based on Parmentier's information and further investigation, Laurie Moore, brother of Plaintiff Walter Moore, was arrested and charged with the Tobias murder. Then, in early June, Debra Parmentier was interviewed by Boerema at a hotel in Gaylord. At that time, Parmentier indicated that two others (beside Laurie Moore) were involved in the Tobias murder. Boerema's notes indicate that Parmentier also made a number of allegations of criminal conduct (drug and weapons trafficking) on the part of Canter and Moore and others. See Att. # 48; # 126, at 156–62. Boerema characterized Parmentier's allegations as incredible, and delivered copies of his notes to the Defendants John Hardy and Frederick LaBarge and discussed their contents with these two State Police detectives and Prosecutor Hayes. *See* Att. # 126, at 153, 159–60.

At around the same time, Parmentier was interviewed by Agent Val Goddard of the Bureau of Alcohol, Tobacco, and Firearms, concerning allegations she had made about theft of weapons from military bases and weapons trafficking. *See* Att. # 153.

---

**3.** The "Attachment" or "Att." citations in this Opinion refer to the numbered exhibits originally presented by Plaintiffs with their 1998–1999 briefs opposing the State Defendants' first motion for dismissal/summary judgment. Plaintiffs have expressly incorporated by reference these attachments in their Brief in Opposition to the State Police Defendants' current motion. *See* Response Brief, pp. 3–4, n. 1.

Parmentier was interviewed by Thomas Soreno, a Northern Michigan radio talk show host. Soreno later testified that he turned the tape of this interview over to Boerema. *See* Att. # 89, at 13, 17–18. According to Plaintiffs, the report of Agent Goddard, Boerema's interview notes and Soreno's interview tape were not disclosed to Plaintiffs until after their trials.

Over the course of 1987, Parmentier registered a number of criminal complaints against her husband, Leonard, apparently in connection with divorce proceedings that had been initiated between the two. These complaints included allegations of assault, rape, and harassment by Leonard. *See* Att. # 61; # 113. Defendant Schumacher refused to authorize arrest warrants because she determined that the charges were baseless and that Parmentier lacked credibility. *See* Att. # 27, at 2939; # 73; # 113, at 87–89, 96–100, 109–10, 112. In addition, the report of State Police Trooper Yarsevich who investigated the alleged incidents noted that she had previous psychological problems. *See* Att. # 61. The information relating to these charges was known to Hayes, Schumacher, and Hardy. *See* Att. # 27, at 2939–40; # 72; # 113, at 113. Further, Schumacher, representing the prosecutor's office on behalf of the Parmentiers' children, cross-examined Parmentier at a show cause hearing held on January 17, 1987. In connection with this, Schumacher obtained Parmentier's medical history, which indicated that she had psychological problems, that the rape allegation against her husband had been feigned, and that Parmentier had drug problems. *See* Att. # 67. In addition, a psychological screening report prepared in connection with the divorce proceedings indicated that Parmentier had a pattern of lying and exhibited psychological problems. *See* Att. # 93. Again, according to Plaintiffs, none of this information bearing on Parmentier's credibility was disclosed to them during the criminal proceedings.

Parmentier gave several statements to Defendants on March 8 and 9, 1988. These statements were not produced until the evidentiary hearings in 1994 following Plaintiffs' convictions. These statements contained fanciful tales of international gun and drug trafficking involving Plaintiff Canter and Douglas Brinkman, one of his co-defendants in the Tobias case. *See* Att. # 144; # 15, at 112–18; # 124, at 133–40. Several other incidents which would have called into question Parmentier's credibility occurred at about this time, all of which were suppressed according to Plaintiffs.

There is no dispute that Parmentier's testimony was the core of the prosecution's case; without the testimony, there was virtually no evidence linking Plaintiffs Canter or Moore to the death of Tobias. *See* Att. # 18, at 21; # 53, at 198. On April 5, 1988, based on Parmentier's testimony and the testimony of Defendant LaBarge, a warrant was issued charging Canter and Moore with open murder and conspiracy to commit murder in connection with the Tobias killing.[4]

---

4. Prior to the preliminary examination, Cindy Gleason, another witness, had given a statement to the State Police indicating that Parmentier was in her home over the entire December 5–7, 1986 weekend, making it impossible for her to be an eyewitness to the crime. However, at the preliminary examination Gleason testified that Parmentier was not at her home, based on diary entries for the days in question. *See* Att. 20, at 2279– 81, 2348–53. A defense expert subsequently determined that the entries for those dates were not written contemporaneously with other entries around those dates, *see* Att. # 103, and Gleason ultimately admitted that she lied at the preliminary investigation and falsified the diary entries at Parmentier's instigation. See Att. # 20, at 2348–53, 2428–30.

Before and during Canter and Moore's trials, a number of additional events bearing on Parmentier's credibility occurred, none of which, according to Plaintiffs, were disclosed. Specifically, according to Plaintiffs, the following information was known to the State Police and County Defendants but not disclosed: (1) a July 1, 1988 psychological evaluation of Parmentier, *see* Att. # 96; (2) Parmentier was driven by Curt Beerens[5] to the murder scene to view the layout, in violation of the trial court's sequestration order, *see* Att. # 3, at 732; (3) during this trip, at Parmentier's instigation, Beerens fired a shotgun into Gleason's residence, and Mark Kerry fired a rifle shot on a later occasion, *see* Att. # 3, at 730–31; Att. # 19, at 613–21; # 145 at 2167–79; (4) Parmentier was given living expenses and a "salary" by the State Police during the proceedings, *see* Att., # 26, 141; and (5) Parmentier was having sexual relations with Michigan State Police Trooper Thomas Dunnebeck who was assigned to protect her, *see* Att. # 208, at 71–72. Also, prior to testifying, Parmentier was seen in the possession of trial transcripts of other witnesses' testimony, police reports and newspaper articles concerning what was disclosed at trial which Plaintiffs contend were provided to her by the State Police and County Defendants. *See* Att. # 3, at 722–26; # 19, at 662–67; # 31, at 615–17, 928; # 58, at 411–43; # 112, at 9–14; # 114; # 170, at 540–41.

Plaintiff Walter Moore's trial commenced on July 15, 1988, and continued through August 1, at which time it was submitted to the jury. On August 12, the jury acquitted Moore of first degree murder and conspiracy to commit murder, but found him guilty of second degree murder. On November 16, Plaintiff Moore was sen-tenced to life imprisonment. Plaintiff Canter's trial commenced on November 1, 1988, and continued through December 9. The jury found Canter guilty of aiding and abetting second degree murder, and he was likewise sentenced to life imprisonment.

According to Plaintiffs, during their trials the prosecution continued to suppress evidence relating to Parmentier's credibility, particularly her involvement in a number of crimes. Further, during the Canter trial, Parmentier's credibility was sharply attacked by defense counsel. The morning following her cross-examination, Parmentier indicated, for the first time, that another witness, Sherry Payton, was present at the murder scene. (Parmentier subsequently indicated that she lied about Payton's presence at the murder scene.) Payton had, on December 10, 1986, denied any knowledge of the Tobias homicide. *See* Att. # 106. Further, time cards from Payton's employer confirmed that she was working at the time of the Tobias murder. *See* Att. # 93.

Payton, however, had an outstanding warrant for her arrest on false check charges in Grayling, Michigan. Although she had moved to Florida, she returned to Grayling, to surrender on the false check charges. When she returned to Grayling, she surrendered to the Grayling police, whereupon she was subsequently taken into custody by the State Police and taken to the State Police post in Gaylord. Payton claims that she was coerced into testifying that she was at the murder scene, thereby corroborating Parmentier's testimony, under threat of being jailed for a long period and losing custody of her then unborn child. Payton testified at the Canter trial, corroborating Parmentier's testi-

---

5. Curt Beerens was one of a number of men who had been intimately involved with Debra Parmentier. The two lived together for a while during the pendency of the Canter/Moore pre-trial and trial proceedings.

mony. After the jury reached its verdict, the jurors met with the judge and attorneys, and indicated that but for Payton's testimony they would not have convicted Plaintiff Canter. *See* Att. # 52, at 13.

In December 1989, at the request of Canter's trial counsel, the Michigan Attorney General commenced an investigation into Canter's conviction. As part of this investigation, the Attorney General investigator and Canter's counsel met with Sherry Payton. Payton was given immunity on the condition that she tell the truth, and she recanted her trial testimony, stating that she had no information about the Tobias homicide and that she was threatened to so testify by the Michigan State Police. *See* Att. # 186, at 82–84; # 210. The Attorney General's office continued the investigation, ultimately releasing an extensive report on the irregularities in the Plaintiffs' trials. *See* Att. # 6. Based on the recanted testimony, Plaintiff Canter moved for a new trial on the basis of newly discovered evidence. Canter's motion was denied. In the meantime, Plaintiff Moore moved for a remand in the court of appeals so that he could likewise file a motion for a new trial. This request was denied, but on April 16, 1991, the Michigan Supreme Court vacated the court of appeals's decision and ordered the case remanded to the trial court. *See People v. Walter Moore,* 437 Mich. 973, 467 N.W.2d 599 (1991).[6]

Canter appealed the trial court's denial of his motion for new trial. On December 21, 1992, the Michigan Court of Appeals remanded Canter's case to the trial court. The court of appeals determined that Canter was entitled to an evidentiary hearing on his claims of prosecutorial misconduct. *See People v. Canter,* 197 Mich.App. 550, 496 N.W.2d 336 (1992).

Following remand, and in connection with their new trial hearings (which had been consolidated), several thousands of pages of documents were finally disclosed to Plaintiffs, notwithstanding Hayes's testimony that all exculpatory information had been disclosed. In the summer of 1994, Parmentier was charged with eight counts of perjury. In February, 1995, Parmentier gave a lengthy statement to Plaintiffs' counsel indicating that her testimony implicating Plaintiffs was false and detailing many of the events described above.

The Otsego County Circuit Court subsequently advised counsel that he was granting Plaintiffs' motions for new trial. Then Otsego County Prosecutory Kevin Hesselink, Norman Hayes' successor, decided to recharge Plaintiffs. The trial court, however, ruled that Parmentier's previous testimony would not be admissible and ordered a new preliminary examination. Without Parmentier's testimony Hesselink had virtually no evidence to support the charges against Canter and Moore. Therefore, the court found no probable cause, and the cases against Plaintiffs were dismissed.

## PLAINTIFFS' CLAIM AGAINST THE RNI DEFENDANTS

As indicated above, in addition to naming the State Police Troopers and Otsego County officials as defendants, Plaintiffs are also suing Research North, Inc. ("RNI"), a private investigation/surveillance firm, and Charles Rettstadt, the owner of the firm. Plaintiffs' single claim for conspiracy against RNI and Rettstadt is predicated upon the alleged secret "moonlighting" of Defendants Hardy and LaBarge as RNI employees while they were employed as Michigan State Police. The substance of their claim is that

---

**6.** At around this same time, the *Detroit News* published a five part investigative story detailing some of the irregularities in the Moore and Canter trials. *See* Norman Sinclair, *Who Killed Jerry Tobias* (five-part series), DETROIT NEWS, May 5–9, 1991, at A1.

RNI/Rettstadt passed confidential defense information to the Otsego County Prosecutor's office "through either Defendant Hardy or Defendant LaBarge."

## IV. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[7] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in

---

**7.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

deciding the pending motions for summary judgment in this case.

## B. *DEBRA PARMENTIER'S "STATEMENT"*

Before proceeding with a discussion of Defendants' arguments, the Court must first address the issue of admissibility of the lengthy, unsworn, unverified oral "statement" given by Debra Parmentier on February 23, 1995 to Plaintiffs' attorney, Ray MacNeil. Despite the Court's previous rulings expressing concerns about the admissibility of Ms. Parmentier's statement, *see* September 30, 1999 Opinion and Order, pp. 8–9 and p. 5 n. 5, and 10/18/01 Opinion and Order, p. 25 n. 13, Plaintiffs continue to rely heavily on the statement to demonstrate that material issues of fact exist which preclude entry of summary judgment in favor of Defendants.

Plaintiffs contend in their Response Brief that the Court made its previous rulings about Parmentier's statement based upon the misapprehension that Parmentier had not been served with process in this matter. Because Ms. Parmentier was served "by publication," and because Plaintiffs now have now submitted a transcript of the statement which has been certified by the court reporter who transcribed it, they now maintain that the issues of inadmissibility of Parmentier's statement are resolved. Therefore, they argue that the Court should consider the Parmentier statement in deciding Defendants' Motions for Summary Judgment.

Plaintiffs argue that the Parmentier statement is admissible under two hearsay rules, F.R.E. 801(d)(2)(A), as a statement of a party-opponent, and F.R.E. 804(b)(3), as a statement against interest.

### 1. *Admissibility under Fed.R.Evid. 801(d)(2)(A)*

At the heart of Plaintiffs' argument is their contention that Parmentier's statement is admissible as "an admission of a party-opponent" pursuant to Fed.R.Evid. 801(d)(2)(A), which provides:

> **(d) Statements which are not hearsay.**
> A statement is not hearsay if—
>
> \* \* \* \* \* \*
>
> **(2) Admission by party-opponent.** The statement is offered against a party and is (A) the party's own statement, in either an individual or representative capacity. . . .

Thus, under Rule 801(d)(2)(A), the proponent of admit an out-of-court statement must satisfy two requirements: (1) that the statement is made by a "party"; and (2) that the statement is offered "against" that party.

As an initial matter, none of the parties has addressed the issue of whether a person who has merely been served with process but who has never appeared in the action constitutes a "party" at all for purposes of Rule 801(d)(2). As the Advisory Committee Notes indicate,

> Admissions by a party-opponent are excluded from the category of hearsay on the theory that *their admissibility in evidence is the result of the adversary system* rather than satisfaction of the conditions of the hearsay rule.

Fed.R.Evid. 801(d)(2), Advisory Committee Notes to Rule 801(d)(2).

Among the rationale supporting admissibility of a party's own out-of-court statements is that he or she "is present in court to explain, deny or rebut the offered statement." 5 *Weinstein's Evidence* 801–44 (2d. ed). Here, however, while Ms. Parmentier has been technically served with process by substituted service "by publication," she has never answered or otherwise appeared in this matter. Thus, although she is titularly a "party," she is not yet an "opponent" in the sense of having joined the adversary process to contest claims and be tested by the evidence. According-

ly, no presumption exists in this case that she will be "present in court to explain, deny or rebut the statement in this case." This is particularly important where, as here (and discussed further below), the out-of-court statement is offered not for the purpose of advancing claims against the absent party—and, therefore, holding her responsible for the statement—but rather, is offered against other parties in the case. Therefore, it is highly doubtful whether Ms. Parmentier's statement qualifies as a statement of a "party-opponent".

However, even assuming that the statement would satisfy the first prong, Plaintiffs' argument that Ms. Parmentier's statement should come in as an admission of a party overlooks a fundamental requirement of 801(d)(2)(A): that is, a party's own statement is admissible as nonhearsay *only if it is offered against that party. See, Stalbosky v. Belew,* 205 F.3d 890, 894 (6th Cir.2000). *See also, United States v. Sauza–Martinez,* 217 F.3d 754, 760 (9th Cir.2000) (finding that one defendant's statements were not admissible as party-admissions against co-defendant); 5 *Weinstein's Federal Evidence* 801–42 (2d. ed.).[8]

The *Stalbosky* case is instructive. The action arose out of William Belew's rape and murder of Myra Stalbosky. Belew was driving a truck on behalf of Three Rivers Trucking Company when he came upon a stranded motorist, Myra Stalbosky,

at an interstate rest area. He later raped and murdered her in the cab of his truck. Michael Stalbosky, as administrator of Myra Stalbosky's estate, subsequently filed suit against both Belew and Three Rivers Trucking. He alleged that Three Rivers should be held liable for negligently hiring and retaining Belew because the company knew or should have known that Belew posed an unreasonable risk to members of the general public such as Mrs. Stalbosky.

The district court granted Three Rivers' motion for summary judgment holding that Stalbosky had not raised a genuine issue of material fact under Kentucky law that would allow recovery in his favor. In so doing, the district court refused to consider an affidavit that Stalbosky sought to rely on to prove his negligent hiring/retention claim which contained a statement made by Defendant Belew that Randy and Sonny Crutcher, the owners of Three Rivers Trucking, knew of his prior criminal history, but told him not to worry about it. The Court of Appeals affirmed the district court's ruling, explaining:

> The district court disregarded [the affidavit] testimony as hearsay. On appeal, Stalbosky argues that Blakeley's statement was admissible under Rule 801(d)(2) of the Federal Rules of Evidence as an admission by Belew, a party-opponent. **Belew is a party to this**

8. *Cf., Savarese v. Agriss,* 883 F.2d 1194 (3rd Cir.1989) (holding that a statement of a member of the board of directors of a corporate party defendant (who, along with the other six members of the board, was also named as a party-defendant) who died during the course of proceedings was admissible at trial as a statement made in his representative capacity and a vicarious admission of the corporate defendant under Rule 801(d)(2)(D)). The *Savarese* case is readily distinguishable from the instant action because, as indicated, the court found that the deceased board member's statement in that case admissible against the

corporation *as a vicarious admission of the corporate party-defendant* which was present at trial. The statement was not offered against the deceased board member, individually. 883 F.2d at 1200–01. Indeed, Dan Bogen, the board member in question, was only sued in his representative capacity; he was not sued in his individual capacity. 883 F.2d at 1200. Furthermore, unlike Ms. Parmentier who has never appeared in this matter, Mr. Bogen did appear *and participated* in the action during the course of pretrial proceedings, although he died prior to trial.

action, *but the statements that are at issue here were not offered against Belew,* but rather against Three Rivers to establish its knowledge of Belew's prior criminal history. Under Rule 801(d)(2)(A), a party's statement is admissible as non-hearsay only if it is offered against *that* party. The district court therefore properly refused to consider Blakeley's affidavit.

205 F.3d at 894 (emphasis added).

■■■■■ Like the plaintiff in *Stalbosky,* Plaintiffs here offer Debra Parmentier's February 1995 statement not against Parmentier but rather against her co-defendants to establish the co-defendants' culpability. The statement, thus, is not admissible against the State Police Defendants or the RNI Defendants under Rule 801(d)(2)(A).[9]

### 2. Admissibility under Fed.R.Evid. 804(b)(3)

■■■■ Plaintiffs also argue, without briefing, that Parmentier's statement is admissible under Fed.R.Evid. 804(b)(3). This hearsay exception provides as follows:

**(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

**(3) Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The rationale behind the statement against interest exception is that a reasonable person would not make a damaging statement *against himself or herself* unless it is true. 5 Weinstein's Evidence 804–54. However, only those particular portions of the February 1995 Parmentier statement that inculpate Debra Parmentier—not her

**9.** The same is true for Plaintiffs' arguments that Parmentier's statement is admissible against the other defendants as an "authorized" admission under 801(d)(2)(C), as a "vicarious" admission under 801(d)(2)(D), or as a co-conspirator's admission under 801(d)(2)(E). Moreover, even if Plaintiffs were permitted to offer Parmentier's statement against her co-defendants substantively, the statement does not meet any of the requirements of Rules 801(d)(2)(C), (D), or (E).

With respect to "authorized admissions" under 801(d)(2)(C), this hearsay exemption only applies to statements made by a person who has been authorized by the party against whom it is being offered to make a statement concerning the subject. There is no possible basis in this case for finding that any of the State Police Defendants or the RNI Defendants authorized Debra Parmentier to make

any statement. The same is true of 801(d)(2)(D). This hearsay exemption applies only to statements by an agent of the party against whom they are offered. There is no basis for finding that Debra Parmentier was the agent of any other Defendant in this case. Moreover, only statements concerning matters within the scope of the agency relationship and made during the existence of the relationship constitute "vicarious admissions" under 801(d)(2)(D).

Finally, 801(D)(2)(E) only applies to a statement by a co-conspirator of the party against whom the statement is being offered that is made "during the course and in furtherance of the conspiracy." Parmentier's statement here was not made "during the course of" the alleged conspiracy, nor was it made "in furtherance of" the conspiracy.

entire narrative—are admissible under Rule 804(b)(3). *See Williamson v. United States,* 512 U.S. 594, 599–600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements.") *See also, United States v. McCleskey,* 228 F.3d 640, 644 (6th Cir.2000) (holding that where a party seeks to introduce a statement, otherwise hearsay, which inculpates its declarant but which, in its detail, also inculpates the opposing party by spreading or shifting onto him some, much, or all of the blame, the out-of-court statement ... "is garden variety hearsay as to the defendant and it does not lose that character merely because it in addition reliably inculpates the declarant." *Id.*)

A recent Sixth Circuit decision, *McClung v. Wal–Mart Stores, Inc.,* 270 F.3d 1007 (6th Cir.2001), is instructive on this point.

In *McClung* the appellate court held that a deceased murder/kidnaping perpetrator's statements placing him at the same location as the victim subjected him to sufficient penal liability that a reasonable person would not have made the statements unless he believed them to be true. *Id.* at 1015. Hence, the court found the statements to be covered by Rule 804(b)(3). *Id.* In making this determination, the *McClung* court explained, "Whether a statement is self-inculpatory or not can only be determined by viewing it in context." *Id.,* (quoting *Williamson, supra,* 512 U.S. at 603, 114 S.Ct. 2431).

At issue in *McClung* were two statements made by the perpetrator of the kidnap/murder, Joseph Harper, shortly after the commission of the crime. The court determined that the statement made by Harper, on September 8, 1990, the day after Mrs. McClung's abduction, that he had abducted Mrs. McClung from a "Circus City" parking lot in Memphis, and his subsequent statement to police on September 20th detailing the abduction in which he stated that he "walked over to Circuit City and the Wal Mart, the nearest store, and I seen this lady, and that's when I thought I should get her car. . . . So when she came out of the store, she got in her car and I got in right behind her,"

> place him at the same location as the victim, as shown by the Wal–Mart cash register receipts, and are evidence of his opportunity and intent to commit the crime. These statements were contrary to Harper's penal interest and there is no reason to suggest that Harper would have made these statements without believing them to be true.

270 F.3d at 1014–15.

However, although the court found the statement against interest exception applicable to the statements, the appellate court determined that the statements must also be found to be reliable before the district court could consider them.

> In addition to satisfying the statement against interest exception, Harper's statements must satisfy the general reliability standard. We see no reason to find Harper's first two statements unreliable. Although it is not entirely clear, it appears that the district court found the statements reliable when he concluded that "[t]he proof indicates that Mrs. McClung was abducted from the Delta Square Shopping Center parking lot." (J.A. 791.) In any event, the district judge is not foreclosed from considering the reliability of Harper's first two statements on remand.

*Id.* at 1015.

Turning to Debra Parmentier's statement at issue in this case, the Court finds the lengthy statement—actually many "statements" strung together—to include numerous statements against Ms. Parmentier's penal interest within the meaning of Rule 804(b)(3). In fact, the Court finds

two potential penal "interests" implicated: broadly stated, the statement would appear, in portions, to subject Parmentier to liability for (1) perjury, for which she was already under indictment; and (2) a conspiracy to obstruct justice. Statements within the 126–page Parmentier "statement" which, by their context, would subject Ms. Parmentier to criminal penalty for either perjury or obstruction of justice would be within the scope of Rule 804(b)(3). However, a number of factors raise serious questions about the reliability of Ms. Parmentier's statement, including the facts that she is an admitted perjurer, that she changed her story several times, that she apparently has a history of mental instability, and, finally, that Plaintiffs' attorney, Raymond MacNeil, facilitated Ms. Parmentier's statement by posing to her specifically worded, leading questions.

 Although these factors do raise serious questions about Ms. Parmentier's credibility in general and the reliability of the statements in particular, ultimately the factors go to the weight to be given them by the jury. Therefore, before the Court will admit any inculpatory statements from within the 126–page Parmentier statement, the Court will require, as indicia of reliability, some independent corroboration for each proffered statement. Such corroborative evidence, however, must itself be admissible evidence. Furthermore, what other people say Ms. Parmentier told them will not be deemed sufficient corroborative evidence for what Ms. Parmentier said in her statement.[10]

This procedure requiring independent corroborative evidence is consistent not only with the Sixth Circuit's ruling in *McClung* in which the appellate court directed the trial court to consider on remand the reliability of the perpetrator's parking lot location-of-the-crime statements, but it is also consistent with the proposed amendment to Fed.R.Evid. 804(b)(3).

As indicated above, Rule 804(b)(3) currently only requires corroboration when a statement against interest is offered to exculpate an accused in a criminal case. *See* Fed.R.Evid. 804(b)(3), last sentence: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. There is currently a proposed amendment to Rule 804(b)(3) which will require corroboration in all cases, civil as well as criminal. The proposed amendment will change the last sentence of the rule by deleting therefrom and offered to exculpate the accused," such that the rule will read simply, "A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." The Advisory Committee Notes regarding the proposed amendment offers some guidance as to what will constitute sufficient corroboration.

The Committee notes that there has been some confusion over the meaning

---

**10.** Plaintiffs also have argued that the Parmentier statement is admissible under the residual hearsay exception in Fed.R.Evid. 807. This "catch-all" exception allows for the admission of statements not covered by the exceptions enumerated in Rules 803 and 804, but which have "equivalent circumstantial guarantees of trustworthiness." Given that prior to making the statement Debra Parmen-

tier was already found to have perjuriously testified to many of the same matters she addresses in her 1995 statement, and given Plaintiffs' own abundant evidence of other incidents of her lying, it can hardly be said that Ms. Parmentier is a trustworthy witness. Therefore, the Court will not admit her statement under this residual exception.

of the "corroborating circumstances" requirement. . . .

The case law identifies some factors that may be helpful that may be useful to consider in determining whether corroborating circumstances clearly indicate the trustworthiness of the statement. Those factors include (*see e.g., United States v. Bumpass,* 60 F.3d 1099, 1102 (4th Cir.1995)):

(1) the timing and circumstances under which the statement was made;

(2) the declarant's motive in making the statement and whether there was reason for the declarant to lie;

(3) whether the declarant repeated the statement and did so consistently, even under different circumstances;

(4) the party or parties to whom the statement was made;

(5) the relationship between the declarant and the opponent of the evidence; and

(6) the nature and strength of independent evidence relative to the conduct in question.

Other factors may be pertinent under the circumstances. The credibility of the witness who relates the statement in court, however, is not a proper factor for the court to consider in assessing corroborating circumstances. To base admission or exclusion of a hearsay statement on the credibility of the witness would usurp the jury's role in assessing the credibility of testifying witnesses. *United States v. Katsougrakis,* 715 F.2d 769 (2d Cir.1983).

The corroborating circumstances requirement assumes that the court has already found that the hearsay statement is genuinely disserving of the declarant's penal interest. *See Williamson v. United States,* 512 U.S. 594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (statement must be "squarely self-inculpatory" to be admissible under Rule 804(b)(3)). "Corroborating circumstances" therefore must be independent from the fact that the statement tends to subject the declarant to criminal liability. The "against penal interest" factor should not be double-counted as a corroborating circumstance.

July 30, 2001 *Report of the Advisory Committee on Evidence Rules, Proposed Amendments to the Federal Rules of Evidence.*

For all of the foregoing reasons, the Court will address Defendants' pending Motions for Summary Judgment without considering the Parmentier statement. Where Plaintiffs have already presented independent evidence supporting their claims, summary judgment will be denied. On the other hand, where Plaintiff's have not presented any independent evidentiary support for their claims, those claims will not survive. Plaintiffs may, however, seek admission of the Parmentier statement at trial if they comply with the independent corroboration requirement discussed above.

## C. *THE STATE POLICE DEFENDANTS' MOTION*

As indicated above, the claims remaining for adjudication in this action are Plaintiffs' Section 1983 claims for malicious prosecution against State Police Defendants Hardy and LaBarge in Count I and against Defendant Goeman in Count II; their claim of denial of fair trial/due process based on subornation or perjury, intimidation of witnesses and destruction of evidence in Count IV against all of the State Police Defendants; and their Section 1983 conspiracy claim against the State Police Defendants, the RNI Defendants, and Debra Parmentier in Count VIII.

With respect to the State Police Defendants' Motion, on the law the parties have not offered any new or additional legal

arguments regarding Plaintiffs' claims of malicious prosecution, denial of fair trial/due process or conspiracy against the State Police Defendants.[11] Therefore, with respect to the law, the Court incorporates by reference its previous summary judgment rulings in this case and will turn to an examination of whether, now that discovery has closed, the evidence of record establishes that there is no genuine issue of material fact precluding summary judgment.

### 1. Counts I and II (malicious prosecution under 42 U.S.C. § 1983)

It is well-settled that a claim under 42 U.S.C. § 1983 requires a showing that the plaintiff possessed a constitutional right; that he or she was deprived of that right; and that the deprivation was caused by the reckless or intentional conduct of a person acting under color of state law. See Ahlers v. Schebil, 966 F.Supp. 518, 528 (E.D.Mich.1997), aff'd, 188 F.3d 365 (6th Cir.1999).

Counts I and II center upon the prosecution of Plaintiffs in 1988 and the attempted re-prosecution of them in 1996. With respect to the State Police Defendants, in these counts Plaintiffs contend that due to the Defendants Hardy's, La-Barge's and Goeman's misconduct, they were arrested, charged, tried, and imprisoned for a crime without probable cause.

It is well-settled that an arrest warrant is valid only if supported by probable cause. U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause....") Probable cause exists where "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. See, Brinegar v. United States, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949). See also, Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) (Probable cause requires "reasonably trustworthy evidence" of the commission of a crime.)

Thus, the initial focus in determining whether probable cause existed in this case is whether the facts known at the time of Canter and Moore's arrest amounted to probable cause. Criss v. City of Kent, 867 F.2d 259, 262 (6th Cir.1988). A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to

---

**11.** With respect to Plaintiffs' malicious prosecution claims, the State Police Defendants incorporate by reference the briefs filed by their former Otsego County co-defendants and urge the Court to follow the Sixth Circuit's decision in Frantz v. Village of Bradford, 245 F.3d 869 (6th Cir.2001) and find no cognizable § 1983 malicious prosecution claim exists under the facts of this case. However, the Sixth Circuit recently held that Frantz could not and did not overrule Spurlock v. Satterfield, 167 F.3d 995 (6th Cir.1999), in which the court interpreted the Supreme Court's plurality opinion in Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), as authorizing a Fourth Amendment malicious prosecution claim. See Darrah v. City of Oak Park, 255 F.3d 301, 309 (6th Cir.2001). (This Court's previous summary judgment ruling applied Spurlock.) In any event, the appellate court was in agreement in all of these cases that a Section 1983 malicious prosecution claim is cognizable as a Fourth Amendment unlawful seizure claim. Even the Frantz court stated, "Clearly, an arrest without probable cause violates the Fourth Amendment, and if a prosecution follows from such arrest, then it may constitute damages recoverable under the Fourth Amendment." 245 F.3d at 876. In substance, this is what is alleged in Counts I and II against Defendants LaBarge, Hardy and Goeman. Plaintiffs allege that they were arrested, then charged, and then prosecuted for the murder of Jerry Tobias without probable cause. Therefore, they may pursue their Section 1983 malicious prosecution claims in this action.

sustain an arrest. *Ahlers v. Schebil, supra,* 188 F.3d at 370. An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation. *Id.*

With respect to Count I (the 1988 prosecution), Plaintiffs have named Defendants Hardy and LaBarge as a defendants in this Count. The State Police Defendants contend, however, that only Defendant LaBarge signed the affidavit for warrants to arrest Plaintiffs and the complaints charging them with murder and conspiracy to commit murder and that, although Defendant Hardy was LaBarge's supervisor at the time, he was not involved in the discussions to prosecute Plaintiffs. There being no *respondeat superior* liability under 42 U.S.C. § 1983, the State Defendants argue that no claim for malicious prosecution may lie against Defendant Hardy. Defendant LaBarge argues that he had a right to rely on the eyewitness statement of Debra Parmentier in signing the probable cause affidavit for Plaintiffs' arrest.

First, both Defendants Hardy and LaBarge admitted under oath during the New Trial proceedings that Debra Parmentier's allegations were the sole evidence connecting Plaintiffs to the murder of Jerry Tobias; no other evidence, such as fingerprints, DNA evidence, or the like existed. *See* Plaintiffs' Att. 18, pp. 20–22; Att. 53, p. 198–199; Att. 65 p. 198. Hardy testified that Parmentier was the linchpin witness, the only witness tying Walter Moore and Mark Canter to the Tobias homicide. Att. 18, p. 21. LaBarge testified that without Parmentier's testimony there was no case against Canter or Moore. Att. 53, p. 198. *See also,* Hardy's testimony at the Aug. 25, 1994 New Trial

Hearing ("Any lack of her [Parmentier's] credibility would hurt the case." *Id.* at p. 23.)

Turning first to Defendant LaBarge's argument, as indicated above, an arresting officer may rely upon an eyewitness as probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying. *Ahlers, supra.* While Defendant LaBarge has presented his affidavit in which he states that he was convinced that Debra Parmentier was telling the truth, *see* State Police Defendants Ex. 1, ¶¶ 4, 5, 13, Plaintiffs have come forward with evidence showing that well in advance of his signing of the warrant to arrest Plaintiffs, Defendant LaBarge was presented with abundant evidence showing that Debra Parmentier was not a credible witness. *See* Plaintiffs' Att. 126, pp. 152–54; Att. 72; Att. 61.

For example, the county prosecutor's investigator, Jerry Boerema, testified that he interviewed Debra Parmentier and made notes of his interviews in which he noted that, in his opinion, Parmentier's statements were simply not believable. In these statements to Boerema, Parmentier had stated that Tobias was stabbed and hit with a baseball bat and that the killing took place in Glen's Market parking lot, and that "two others" (not five) were involved. She further had spun endless, unbelievable, fabricated fantasies concerning local judicial misconduct, her participation in international gun and drug running activities, her involvement in a conspiracy to steal weapons from the National Guard arsenal in Grayling, flying helicopters, and blowing up islands. Boerema testified that he personally delivered copies of his notes of the Parmentier interviews to Defendants LaBarge and Hardy and reviewed the notes with them. Att. 126, pp. 151–62. *See also,* Att. 88; Att. 98, p. 1. LaBarge, in

fact, was personally present when in March 1988, less than a month before he signed the warrant charging Canter and Moore with murder based upon Parmentier's allegations, Parmentier gave a statement to ATF Agent Val Goddard about her involvement in international gun running, a tale which LaBarge characterized as "absurd."

Clearly, Plaintiffs have presented evidence which demonstrates that an issue of fact exists as to whether there was a sufficient apparent reason for Defendant LaBarge to believe that Debra Parmentier was truthful in relating her purported eyewitness account of the Tobias murder at the time he signed the complaint charging Plaintiffs with the crime.

 The same is true of Defendant Hardy. As indicated, Defendant Hardy contends he had no involvement with discussions concerning the Plaintiffs or evidence of their involvement in the Tobias murder, *see* Hardy Affidavit, Defendants Ex. 5. However, as discussed above, Plaintiffs have come forward with evidence showing that Hardy had more than mere supervisory duties with the Tobias matter and was specifically involved in matters pertaining to Debra Parmentier's allegations. As noted, Plaintiffs have presented evidence establishing that Hardy was personally delivered copies of county investigator Jerry Boerema's notes regarding his interviews of Debra Parmentier and Boerema testified that he specifically discussed the notes with Hardy. Additionally, State Police Trooper Yarsevich's report regarding Debra Parmentier's charges against her husband in which Trooper

Yarsevich detailed Parmentier's crazy behavior and how she "makes up stories" was personally reviewed by Defendant Hardy on January 6, 1987, i.e., prior to charges being filed against Canter and Moore based upon Parmentier's alleged "eyewitness account." *See* Att. 61; *see also* Police Report, p. 5.[12] Indeed, Hardy admitted under oath that he was concerned about Parmentier's credibility "throughout the investigation" of the Tobias homicide. *See* 8/25/94 New Trial Hearing Tr. pp. 101–102.

Furthermore, Assistant Otsego County Prosecutor Dawn Schumacher testified that she, County Prosecutor Norman Hayes, and Defendants LaBarge and Bur met on a "daily basis" regarding the Tobias murder, and that Defendant Hardy was also frequently in attendance at these meetings. [*See* 2/9/94 New Trial Hearing Tr. Vol. 3, p. 120.] Schumacher further testified that Parmentier's credibility was discussed everyday. *Id.* at 125.

As with Defendant LaBarge, it is clear to the Court that Plaintiffs have presented evidence which creates an issue of fact as to Defendant Hardy's involvement in the decision to charge Plaintiffs Canter and Moore with the Tobias murder and whether Hardy had reason to believe that Parmentier was lying when she told the officers that Canter and Moore committed the crime. Therefore, Defendants motion for summary judgment on Count I of Plaintiffs' Complaint will be denied.

In Count II, the only remaining Defendant is Defendant Carl Goeman. This count of § 1983 malicious prosecution is

---

**12.** Indeed, Assistant Otsego County prosecutor Dawn Schumacher testified that she read Yarsevich's report, reviewed it in detail with Prosecutor Hayes and concluded that Parmentier's charges against her husband were baseless because of Parmentier's lack of credibility. *See* Att. 27, p. 2939; Att. 113, pp. 87–89, 96–100, 109–110, 112. Schumacher, in fact, testified that she had informed Hayes about Parmentier's long history of serious mental disturbances, her fantasies, her drug usage, and habitual lying, and Hayes acknowledged that he knew of Parmentier's extensive psychiatric history. *see* Att. 47, pp. 2459–60, 2471.

predicated upon the attempted re-prosecution of Plaintiffs in 1996. However, it is undisputed that Defendant Goeman had no role in recharging Plaintiffs. He did not sign the information (the county prosecutor did) and Plaintiffs have not come forward with any evidence to establish Goeman's involvement with Plaintiffs' re-prosecution. Therefore, the Court will grant the State Police Defendants' motion for summary judgment on this count.

2. *Count VI—Deprivation of Right to Fair Trial/Due Process:* Subornation of *Perjury, Witness Tampering, Destruction of Evidence*

■ As indicated above, the only "live" claims in Plaintiffs' Count VI are their claims against the State Police Defendants for subornation of perjury, witness tampering/intimidation, and destruction of evidence. Although Defendants contend that no facts support any of these claims against any of the State Police Defendants, Plaintiffs have presented evidence (albeit contradicted by Defendants' proffered affidavits) showing otherwise.

First, with respect to Defendant Wilt, he was the state trooper charged with investigating Debra Parmentier's allegedly "staged" shooting of her apartment. Michael Gilbert, Parmentier's neighbor, testified that Parmentier had asked him and two other individuals, Curt Beerens and Mark Kerry, to shoot up her apartment to bolster her credibility with the State Police. (Parmentier believed that if the police saw that her life was being threatened before testifying at trial on behalf of the State then the police would believe her account of the murder.) Gilbert testified that when Trooper Wilt came to investigate the shooting, Wilt told Gilbert not to worry; that the incident would be "squelched." [2/8/94 New Trial Hearing Tr. Pp. 85–86; 111].

Furthermore, Wilt admits that he concluded that the shooting was staged and, therefore, destroyed all evidence of the shooting. While Defendants maintain that this destruction of evidence was "no harm, no foul" because it occurred after Canter and Moore's trials, appeals were pending at the time, and therefore, evidence should have been preserved in the event of a new trial.

With respect to intimidation of witnesses and subornation of perjury, sufficient evidence has been presented by Plaintiffs to withstand summary judgment on their claim of subornation of perjury with respect to trial witness Sherry Payton. Sherry Payton, gave a statement in May 1990 to investigators from the Michigan Attorney General's Organized Crime and Public Corruption Unit in which she detailed having been brought to the Michigan State Police post in Gaylord for interrogation after she had returned from Florida and had turned herself in to Grayling police on a false check charge. *See* Att. 5, Deposition of Assistant Attorney General Theodore Klimaszewski, Payton and Att. 6, Attorney General's Report. Payton stated that the interrogation began with Prosecutor Hayes and Defendant LaBarge. After a short while, Hayes left, and LaBarge told her he was going to have Trooper Gomez talk to her.

Gomez then took Payton into another room, and told her that "we have proof that you were there [at the Tobias murder.]" [Att. 6, Payton Interview Tr. P. 9.] Payton said she was not there but Gomez kept saying, "Why are you doing this to yourself.... The prosecutor said he will make no deals with you if you don't tell us that you were there. You will go to jail for 10 to 15 years and you're pregnant, how can you have your baby be born in jail, you'll never see your baby again." *Id.*

Payton said she feared the threat of jail and losing her baby, so she finally said, "[O]kay, what the hell do you want me to say," and Gomez, then read from a yellow pad of paper and proceeded to tell her what he wanted her to say about the events of the evening of the Tobias murder. *Id.* pp. 9–10. Payton said Gomez would turn the tape off when he told her what to say, and turn it back on again for his question and answer. *Id.* She further said that Gomez told her that if she ever said anything about what he had said in that office, he would deny it and it would be his word against hers. *Id.* Payton stated that after she gave this "statement," Gomez brought Defendant LaBarge in and her statement was recorded. *Id. See also,* 9/23/94 New Trial Hearing Tr., p. 128. After giving her statement to the State Police, she was jailed in Petoskey. *Id.* at 15. She was allowed no visitors and stated that this "no visitors" instruction had been issued by Defendant LaBarge and the prosecutor [Hayes]. *Id.*[13]

Payton's account of the State Police telling her to lie and threatening her with a long jail term unless she testified that she was at the murder is corroborated by the New Trial Hearing testimony of her boyfriend, Gary Kimberlee. [*See* 2/15/94 New Trial Hearing Tr. P. 18, 41.]

Susan Kerry (now known as Susan Sanders) also told the Attorney General's investigator that she was pressured not to testify on behalf of the defense at Mark Canter's trial. Kerry's ex-husband, Mark, had been involved in a romantic relationship with Parmentier. Susan Kerry stated that she had been contacted by Mark Canter's attorney and asked to testify for him in defense of the Tobias murder charges. Specifically, she said that Canter's counsel wanted her to testify about the character of Debra Parmentier. Before she was to

testify, however, while in a grocery store in the Gaylord area, a Michigan State Police officer approached her and told her that Prosecutor Hayes wanted to talk to her regarding her testimony on behalf of Canter. She was then taken to the Otsego County Prosecutor's office where she met with Assistant Prosecutor Dawn Schumacher. Kerry said she was told that if she testified, her problems with her husband would be made public and the prosecutor did not want her to testify because the information of Parmentier's relationship with her husband would discredit Parmentier. *See* Att. 6, Interview of Sue Kerry.

### 3. § 1983 Conspiracy Claim

█ Finally, with respect to Plaintiffs' Section 1983 conspiracy claim, a conspirator is liable under § 1983 for all acts taken in furtherance of the conspiracy, regardless of whether the conspirator directly participated in the act. *See Pryor v. Cajda,* 662 F.Supp. 1114, 1116 (N.D.Ill.1987). As the Sixth Circuit observed in affirming this Court's denial of Defendants first motion for dismissal/summary judgment,

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

**13.** LaBarge admits conducting the Payton investigation but denies being present in Gaylord when Trooper Gomez interviewed her. *See* 2/18/94 New Trial Tr. pp. 157–58.

*Canter v. County of Otsego*, 14 Fed.Appx. 518, 2001 WL 814937 (6th Cir.2001), (quoting *Weberg v. Franks*, 229 F.3d 514, 526 (6th Cir.2000)).

 As set forth in Section III of this Opinion, there is abundant evidence is of record from which a jury might reasonably find that State Police Defendants Hardy and LaBarge engaged in a conspiracy with others to deprive Plaintiffs of their constitutional rights. In particular, the Court notes the evidence of repeated meetings involving these Defendants concerning the prosecution of Plaintiffs, Debra Parmentier's story and other incidents involving her bearing on her credibility.

Assistant Otsego County Prosecutor Dawn Schumacher testified that she, Defendant LaBarge and Prosecutor Hayes met on a daily basis and at every one of these meetings, the problems concerning Debra Parmentier's credibility and what to do about her anticipated testimony were discussed. *See* 2/9/94 New Trial Hrg. Tr., pp. 120, 125. Schumacher further testified that although Defendant Hardy was not present at every one of these meetings he did attend at least some of them. *Id.* at 120. Defendant Hardy admits that he called a meeting with Prosecutor Hayes, Defendant LaBarge and "several other officers" specifically to discuss what to do about Debra Parmentier's lack of credibility. *See* New Trial Hrg. Tr. pp. 4–16. Although Hardy said he told Prosecutor Hayes he would not be upset if the prosecutor decided to drop the charges against Canter and Moore, he said that he would "go along with" whatever Hayes decided to do. *Id.*

Further, as indicated above, Defendants LaBarge and Hardy, as well as Defendant Wilt who worked under Hardy's supervision, were all well aware of Parmentier's fabrication of threats against her and the shooting antics she engaged others to engage in an attempt to bolster her credibili-

ty. Curt Beerens testified that over the course of the summer of 1988, he talked to Defendant Hardy at least three times per week, pursuant to Hardy's request that Beerens keep him apprised of Parmentier's activities. *See* 2/10/94 New Trial Hrg. Tr. pp. 10–13, 18–19, 56. Beerens specifically told Hardy about Parmentier's request that he shoot up the Gleason residence, her Sand Hill apartment, and the police car in which she was being transported in order to bolster her credibility. *Id.* at 56. Beerens further told Hardy that Parmentier had three-ring binders of transcripts of testimony and boxes of newspaper clippings concerning the Tobias murder and constantly studied these. *Id.* at 10–12. Although all of these matters bore on Parmentier's credibility as a witness, none of this information was ever provided to the defense.

Although Defendants have presented evidence denying the existence of a conspiracy and contradicting the evidence relied upon by the Plaintiffs, it is clear at least that genuine issues of material fact preclude entry of summary judgment on the conspiracy claim, at least as to Defendants Hardy, LaBarge and Wilt.

However, Plaintiffs have not presented any evidence of the involvement of Defendants Bur or Goeman, other than the fact that these defendants worked under Hardy's supervision. The only specific involvement of Goeman in this matter concern his having run a LIEN check to locate Sherry Payton. Although Plaintiffs allege that Goeman ran this LIEN check before Sherry Payton's name was first mentioned by Debra Parmentier as having been at the scene of the Tobias murder, there is no evidence to render Goeman personally liable for conspiracy based upon this action, i.e., there is insufficient evidence to establish that Goeman or Bur "shared in the general conspiratorial ob-

jective" to deprive Plaintiffs of their right to a fair trial. There is similarly insufficient evidence to hold Defendants Goeman and Bur liable for Plaintiffs' denial of fair trial and due process claims in Count IV. Therefore, the State Police Defendants' motion for summary judgment will be granted in favor of these two Defendants.

## D. *THE RNI DEFENDANTS' MOTION*

As noted above, Defendant Research North, Inc. ("RNI") is a private investigation/surveillance firm owned by Defendant Charles Rettstadt. Charles Rettstadt and his company were retained by attorney John Felton who had been appointed to represent Donald Heistand, one of the individuals who, along with Plaintiffs Canter and Moore, was charged with the murder of Jerry Tobias. Rettstadt was hired to locate evidence to support an alibi defense for Mr. Heistand. Rettstadt was retained in June 1988 and his services were completed by September 27, 1988.

Plaintiffs' claim of Rettstadt and RNI's involvement in a Section 1983 conspiracy to deprive Plaintiffs of their civil rights arise out of the alleged secret "moonlighting" of Defendants Hardy and LaBarge as RNI employees at the same time that they were employed as Michigan State Police. Although Defendant Hardy testified that he and LaBarge did not become employed by RNI until after Rettstadt had concluded his services for Donald Heistand and after both Hardy and LaBarge retired from the State Police in January 1989, Plaintiffs' allegations of "secret" employment relate to RNI's employment of the wives of Hardy and LaBarge. According to the RNI Defendants, Linda Hardy worked for RNI during the time of RNI's work on the Heistand investigation but neither of the LaBarges worked for RNI until after the company's work for Heistand was completed.[14]

The substance of Plaintiffs' claim against the RNI Defendants is that they passed confidential defense information to the prosecution "through either Defendant Hardy or Defendant LaBarge." [Complaint, ¶ 157.]

The only evidence of record concerning the information allegedly passed on is information concerning Donald Heistand's neighbors, John and Linda Graham, who had told Rettstadt that Mr. Heistand was home on the night of the murder, thus supporting his alibi defense. Plaintiffs' only "evidence" that this defense information was passed on is some handwritten notes made by Otsego County Defendant Dawn Schumacher which indicates that some information contained in the memo was related from "Charlie." [*See* Plaintiffs' Interrogatory Answer # 41.] In pertinent part, Schumacher's notes state:

—Graham— → heart attack on Sunday afternoon Heistand's neighbor

saw H's car & porch lights on & light on in drive

11:00 porch light on

2:00 —light just went out

light snow on ground—footprints from house to car

no other tracks

Saturday Dan helped neighbor put antennae up

Charlie going to get him to write a stmt & give to Jack.

[*See* Plaintiffs' Ex. A.]

Plaintiffs contend that only the attorneys representing the defendants in the Tobias trial would know about what Mr.

---

14. Linda Hardy, Defendant John Hardy's ex-wife, however, testified in her deposition that her former husband's employment with RNI commenced at least a year before he retired from the State Police. [Plaintiffs' Ex. N., p. 6.]

Graham had said. Schumacher, however, testified that she had no idea who the "Charlie" referred to in her notes is and, after Charles Rettstadt was identified for her, she testified that "he doesn't even look familiar to me." [*See* RNI Ex. H, Schumacher testimony pp. 74–79.] Ms. Schumacher further has stated that she believes the notes in question were made while she was talking to attorney Jack Felton. [Schumacher Affidavit, RNI Ex. K.]

Attorney John Felton testified in his deposition that he was in regular contact with Otsego County prosecutors Norman Hayes and Dawn Schumacher concerning the allegations against his client. [Felton Dep., pp. 82–83, RNI Ex. I.] Felton further testified that part of his job in representing his client was to pass on information that he uncovered that supported his client's defenses, especially when plea negotiations were ongoing. *Id.* at 82, 89–90.

Felton testified that he had no evidence that would lead him to believe that Mr. Rettstadt passed such information along. In fact, he stated that although he did not, as of March 13, 2000 (the date of his deposition) have a specific recollection, he believes that he probably did mention the Grahams and their anticipated testimony to the prosecution at some point in time prior to Donald Heistand's plea. *Id.* at 98, 112–113.[15]

1. *There is Insufficient Evidence to Establish that the RNI Defendants Were "State Actors"*

▮▮ Under Section 1983, liability attaches only to a conduct occurring "under color of law." Thus, the only proper defendants in a § 1983 claim are those who "represent (the state) in some capacity, whether they act in accordance with their authority or misuse it." *National Collegiate Athletic Assoc. v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 462, 102 L.Ed.2d 469 (1988) (quoting *Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961)). Only if the defendants conduct in question constitutes "state action" will section 1983 liability attach. The principal inquiry in determining whether a private party's actions constitute "state action" under the Fourteenth Amendment is whether the party's actions may be "fairly attributable to the state." *See, Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). *See also, Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir.1992).

The Supreme Court and the Sixth Circuit have set forth four tests to determine whether the challenged conduct may be fairly attributable to the state in order to hold the defendants liable under section 1983. These tests are: (1) the public function test, *West v. Atkins,* 487 U.S. 42, 49–50, 108 S.Ct. 2250, 2255–2256, 101 L.Ed.2d 40 (1988); *Flagg Bros. v. Brooks,* 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978); (2) the state compulsion test, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 170, 90 S.Ct. 1598, 1615, 26 L.Ed.2d 142 (1970); (3) the joint action test, *Dennis v. Sparks,* 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *Adickes, supra,* 398 U.S. at 152, 90 S.Ct. at 1605; and (4) the symbiotic relationship or nexus test, *Burton v. Wilmington Parking Auth.,* 365

**15.** However, Mr. Felton has now retreated somewhat from his deposition testimony and has provided an affidavit stating that he did not think he could be the source of the information in Schumacher's notes because he would not have disclosed the information about the Grahams to the prosecutors until after he obtained a recorded statement from them so as to prevent any potential witness tampering. [*See* Plaintiffs' Ex. D.] The Grahams did not give a recorded statement until July 5, 1988, and Plaintiffs claim that the notes refer to actions which were to take place prior to July 5th.

U.S. 715, 721–26, 81 S.Ct. 856, 859–62, 6 L.Ed.2d 45 (1961). *See also, Wolotsky v. Huhn, supra.*

Under the public function test, a private party is deemed to be a state actor if he exercised powers which have traditionally been exclusively reserved to the state. This has been interpreted narrowly. Only functions like holding elections, *see Flagg Bros. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), exercising eminent domain, *see Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and operating a company-owned town, *see Marsh v. Alabama,* 326 U.S. 501, 505–09, 66 S.Ct. 276, 90 L.Ed. 265 (1946), fall under this category of state action. *See also, Wolotsky, supra,* 960 F.2d at 1335. The parties are in agreement that this test has no applicability in this case.

The state compulsion test requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state. *See Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982); *Bier v. Fleming,* 717 F.2d 308, 311 (6th Cir.1983), cert. denied, 465 U.S. 1026, 104 S.Ct. 1283, 79 L.Ed.2d 686 (1984). However, more than mere approval or acquiescence by the state in the initiatives of the private party is necessary to impose liability under this theory. *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785.

State action may also be present if a private party is a willful participant in "joint action" with the State or its agents. *Dennis v. Sparks, supra; Hooks v. Hooks,* 771 F.2d 935, 943 (6th Cir.1985). A requirement of the joint action charge is that both the public and private actors share a common unconstitutional goal to deprive the plaintiff of his constitutional rights. *See Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1446–47 (10th Cir.

1995). Under this approach, state action may be found if a state actor has participated in or influenced the challenged action of the private party. *Id.* Just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient. *Id.*

Under the symbiotic or nexus test, a plaintiff must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be treated as that of the state itself. *See Jackson,* 419 U.S. at 351, 95 S.Ct. 449, 42 L.Ed.2d 477.

Under any of the tests, the state must be intimately involved in the challenged conduct. *Wolotsky,* 960 F.2d at 1335. The inquiry is fact specific and the presence of state action is determined on a case-by-case basis. *See Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

Plaintiffs contend that both the joint action and the nexus test are satisfied in this case so as to establish that the RNI Defendants may be held liable under Section 1983. Focusing on the specific facts at issue here, the only evidence of record which Plaintiffs can point to supporting their claim involving the RNI Defendants in this action is one handwritten note made by Assistant Otsego County Prosecutor Dawn Schumacher indicating that Donald Heistand's neighbor had seen Heistand's car in the driveway and lights on on the night of the Tobias murder and that "Charlie" was going to get a statement from John Graham and give it to "Jack." Ms. Schumacher, however, has testified that she did not know who "Charlie" was but she believed the information in her notes was given to her by Jack Felton, Heistand's attorney. Jack Felton acknowledged that he was in regular contact with Schumacher and the Otsego County

prosecutor's office during the time in question. He further testified in his deposition that he probably gave the information concerning Graham to Schumacher.

Although Felton has attempted to retreat from his deposition testimony by now submitting an affidavit saying that it was not his practice to give alibi witness information to the prosecutor until after he had obtained a recorded statement from the witness and that he did not obtain a witness statement from the Grahams until July 5, 1988, a date which Plaintiffs claim post-dates some of the other information contained in Schumacher's notes, there is no evidence of record to show affirmatively that Felton did not give Schumacher the information. Furthermore, there is nothing in Schumacher's notes to indicate that all of these notes were made on the same date. Rather, they appear to be notes randomly made on a legal pad or notebook and they could have been made over a period of several days. The mere scintilla of evidence Plaintiffs have presented to show that Charles Rettstadt was the source of the information in Schumacher's notes simply is insufficient to withstand summary judgment.

Moreover, Plaintiffs have failed to establish a sufficient connection between RNI and the State to establish "state action." The only basis for Plaintiffs' claim of state action here is that Defendants Hardy and LaBarge and their wives were on the RNI payroll. There appears, however, to be no dispute now that neither of the LaBarges worked for RNI until after RNI's involvement with the Tobias murder case was terminated. As for Defendant Hardy and his ex-wife, there is also no dispute that Linda Hardy did work for RNI on a piecemeal basis during the period in question. Both Defendant Hardy and Defendant Rettstadt have testified that Defendant Hardy did not begin working for RNI until after he retired. Mrs. Hardy, however,

contradicted that testimony and testified that her ex-husband did work for RNI prior to his retirement.

In any event, even accepting the fact that both Defendant Hardy and his ex-wife did work for RNI prior to January 1989, as Plaintiffs themselves emphasize, the focus in determining Section 1983 liability is whether the private party's contested conduct constitutes state action. The state must be "intimately involved *in the challenged conduct*" to establish Section 1983 liability. *Wolotsky,* 960 F.2d at 1335. Here, the challenged conduct is the turning over to the prosecutor of information concerning Donald Heistand's alibi witnesses. The only nexus with the state and RNI is the employment of Defendant Hardy and his ex-wife. There is no evidence of record, however, to establish that Defendant Hardy coerced, requested or suggested to Defendant Rettstadt to provide the alibi evidence to the prosecutors. There is no evidence of Rettstadt's involvement in any meetings with any of the other Defendants or his involvement with any other facet of the Tobias murder investigation or trial. There is simply no evidence establishing any nexus between the State and the turning over of the evidence concerning the Grahams to the prosecutor. Plaintiffs attempt to hold the RNI Defendants liable simply by association on the basis of supposition and conjecture. Clearly, this is an insufficient basis to hold private parties liable as state actors.

However, even assuming *arguendo* that sufficient evidence exists to render the RNI Defendants "state actors," as discussed above, a fundamental requirement of a civil conspiracy claim is "an agreement between two or more persons to injure another by ***unlawful*** action." *See Canter v. County of Otsego, supra,* 14 Fed. Appx. 518 (quoting *Weberg v. Franks,* 229 F.3d

514, 526 (6th Cir.2000) (emphasis added)). Even if Defendant Rettstadt is the "Charlie" in Dawn Schumacher's notes, at best, what this evidence shows is that Rettstadt passed exculpatory information concerning his client to the prosecutor's office, something that is commonly done by defense attorneys (and their agents) in furtherance of plea negotiations with a prosecutor. When all of the smoke of conspiratorial innuendo is blown away from RNI's alleged "disclosure" to the County prosecutor, at worst all that is left is an allegation that an investigator who was the agent of a co-defendant's counsel provided information to the prosecution that was exculpatory to his client in that it corroborated his client's alibi, and, thus, marginally and inferentially inculpated Plaintiffs. It is, of course, not new or novel that a co-defendant (or his counsel or agent) in the context of his own plea negotiations would give authorities information which would both exculpate himself and possibly shift the blame to others. Such is not the stuff of an illegal conspiracy, but rather a natural by-product of the cold, hard world of co-defendants charged with a serious crime. There is, thus, no illegal or unlawful objective.

For the foregoing reasons, the Court will grant the RNI Defendants Motion for Summary Judgment.[16]

### CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that the State Police Defendants' Motion for Summary Judgment is granted in part, and denied in part. The State Police Defendants' Motion is GRANTED with respect to Plaintiffs' claim in Count II against Defendant Carl Goeman. With respect to

Counts VI and VIII, the Motion is also granted as to Defendants Goeman and Bur but DENIED with respect to Defendants LaBarge, Hardy and Wilt.

IT IS FURTHER ORDERED that the RNI Defendants' Motion for Summary Judgment is GRANTED.

Accordingly, this case will proceed to TRIAL on the following claims:

Plaintiffs' Count I claim of malicious prosecution under Section 1983 against Defendants Hardy and LaBarge; and

Plaintiffs' Count VI denial of fair trial and due process claim and their Count VIII Section 1983 conspiracy claim against Defendants Wilt, Hardy, and LaBarge.

SO ORDERED.

---

**16.** The Court's determination that there was no "state action" and no "illegal act" by RNI to hold the RNI Defendants liable in this action renders it unnecessary for the Court to address Defendants' statute of limitation argument.