NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0703n.06

No. 09-2196

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Nov 12, 2010**
LEONARD GREEN, Clerk

JOHN HAMILTON, et al.,                          )
                                                )
        Plaintiffs-Appellants,                  )
                                                )
v.                                              )   ON APPEAL FROM THE UNITED
                                                )   STATES DISTRICT COURT FOR THE
CITY OF ROMULUS, et al.,                        )   EASTERN DISTRICT OF MICHIGAN
                                                )   SOUTHERN DIVISION
        Defendants-Appellees.                   )

Before: GILMAN and GRIFFIN, Circuit Judges; and ROSE, District Judge[*]

        Rose, District Judge.  The underlying matter is a civil rights case under 42 U.S.C. §§ 1983

and 1985(2) with pendant state-law claims.  Plaintiffs/Appellants appeal grants of summary

judgment to the Defendants/Appellees.  For the reasons indicated below, we **AFFIRM** the judgment

of the district court.

I.      BACKGROUND

A.      Factual Background

        The Plaintiffs/Appellants are John Hamilton ("Hamilton") individually and as Trustee of the

John L. Hamilton Retained Annuity Trust, and Hamilton's sons: John Hamilton, Jr., Jeremy

Hamilton, and Michael Hamilton.  Hamilton owns all of the stock of four (4) corporations, which

are also Plaintiffs/Appellants: Jo-Bet, Inc., which operates a bar named Henry the VIII South

---

[*]The Honorable Thomas M. Rose, United States District Judge for the Southern District
of Ohio, sitting by designation.

("Henry's South") in Southgate, Michigan; The Garter Belt, Inc. which operates a bar named Legg's Lounge ("Legg's") in Van Buren Township ("VBT"); Hamilton's Henry the VII Lounge, Inc., which operates a bar named Henry the VII Lounge ("Henry's") in Inkster, Michigan; and Hamilton's Bogart, Inc., which operates a bar named Bogart's Joint ("Bogart's") in Inkster, Michigan.

The Defendants/Appellees are: VBT, VBT Officer Marc Abdilla ("Abdilla") and VBT Director of Planning and Development Bryce Kelley ("Kelley") (collectively the "VBT Defendants"); the City of Romulus, Michigan ("Romulus") and Romulus Officer Michael Ondejko ("Ondejko") (collectively the "Romulus Defendants"); and the City of Inkster, Michigan ("Inskter") Officers Paul Martin ("Martin"), Kenneth Brown ("Brown") and Anthony Abdullah ("Abdullah") (collectively the "Inkster Defendants").

The facts that follow are taken from the district court's orders that are being appealed. The facts presented in the district court's orders are taken from the parties' joint submission of material facts not in dispute.

**1.**

The parties, particularly Hamilton and VBT, have a very long and complicated history of conflict dating back to 1998. At a regular meeting on September 1, 1998, VBT's Board of Trustees adopted Resolution 98-34. The effect of this resolution was to suspend the submission or receipt of projects which would require site plan review, re-zoning, housing development, special approval use and the like, with certain exceptions, for a period of 182 calendar days running from September 2, 1998, through March 2, 1999 (the "Moratorium"). The purpose of the Moratorium was to assist in the revision and updating of VBT's master plan and zoning ordinance. The parties disagree as to whether the moratorium was directed at Sexually Oriented Businesses ("SOBs").

During the Moratorium, VBT conducted a comprehensive review of its Master Plan and Zoning Ordinance and adopted a series of new SOB ordinances. All of the ordinances became effective by March 11, 1999.

By letter dated August 29, 2000, Defendant Kelley informed Hamilton that Legg's was not in compliance with the new and revised SOB ordinances. Hamilton was directed to come into compliance within thirty (30) days. VBT claims that Legg's refused to comply with the SOB ordinances, particularly the Nudity On Licensed Premises Ordinance because Legg's dancers continued to dance virtually naked, had illegal physical contact with patrons and engaged in a host of other prohibited activities.

Believing that Legg's was not in compliance with the applicable SOB ordinances, VBT sought a permanent injunction mandating Legg's compliance. The permanent injunction was sought in Wayne County Circuit Court. The case is captioned as *Charter Township of Van Buren v. The Garter Belt*, No. 00-036479, and is known by the parties as "*Legg's I*." Legg's filed a counterclaim in which it sought to have the VBT SOB ordinances invalidated on constitutional grounds.

VBT prevailed in *Legg's I*. Specifically, the trial court determined that the SOB ordinances in question were without legal or constitutional infirmity and permanently enjoined Legg's from violating the ordinance entitled "Nudity On Licensed Premises." The trial court's decision was affirmed on appeal and the Michigan Supreme Court denied Legg's' application for leave to appeal. The United States Supreme Court then denied Legg's' petition for writ of certiorari. Thus ended *Legg's I*.

Shortly after *Legg's I* was filed, The Garter Belt, Inc. unsuccessfully sought removal of *Legg's I* to federal court. The Garter Belt, Inc. then filed a complaint in federal court in the Eastern

District of Michigan, Case No. 00-60455 reassigned to Case No. 00-CV-75630. This case became what is known as *Legg's II*. *Legg's II* was dismissed on abstention grounds. An appeal was upheld by this Court. Thus ended *Legg's II*.

**2.**

On May 11, 2000, there was a bomb scare at Henry's. The Appellants argue that the bomb scare was executed by Officers Brown and Abdullah, but the person or persons responsible for executing the bomb scare have never been identified.

At approximately 4:30 p.m. to 5:00 p.m. on May 11, 2000, Elvie Gensoli ("Gensoli"), who was acting manager of Henry's at the time, received a call notifying Henry's that there was a bomb threat against Henry's and that the bomb was to explode at approximately 9:00 p.m. that night. Approximately 20 minutes later, the Inkster Police Department arrived with a "bomb" dog. Brown advised Gensoli to have the patrons and dancers exit the bar. After a couple of delays while the "bomb" dog searched, Brown asked Gensoli, who had been asked to wait outside, to enter and give him her keys to the downstairs offices, which were locked.

Brown was given the keys and went downstairs. He returned in approximately 10 minutes with a video tape in his hand. Gensoli asked that the tape be returned, but Brown did not do so and put the tape in his police vehicle. Shortly thereafter, a second "bomb" dog arrived and, in a few minutes, Brown advised Gensoli that the second dog did not find anything.

Brown reviewed the tape and found nothing regarding the bomb threat. He placed the tape in his desk drawer for return to Henry's. However, Officer Martin took and reviewed the tape and filed a formal complaint with the Michigan Liquor Control Commission ("MLCC"), claiming that the tape showed violations of MLCC rules.

Hamilton complained that the tape was taken illegally.  He was, however, advised, that the rules of evidence did not apply in Administrative hearings in the State of Michigan and that the tape could be used by the MLCC.

The videotape was used as evidence in connection with liquor-license-violation proceedings against Henry's before the MLCC.  The Michigan Court of Appeals determined that the videotape was admissible in those proceedings.  The Michigan Supreme Court denied leave to appeal, thus ending the litigation.

**3.**

On April 21, 2002, a customer named James D. Cable ("Cable") died while he was being entertained at Legg's. Following Cable's death, Wendy Pomerico ("Pomerico"), a Legg's dancer, reported to VBT's Department of Public Safety that Cable's body had been tampered with after his death.  Pomerico also stated that she and other dancers were being forced by Hamilton to serve as prostitutes providing sexual favors to various Legg's patrons and that, behind the scenes, Legg's was a house of prostitution.

The VBT Police Department, with the aid of members of a special police task force from Romulus, began a full-scale investigation of illegal activity at and associated with Legg's.  This investigation included the use of confidential informants who were solicited to engage in acts of fellatio, intercourse, and other sex acts by dancers at Legg's for cash.  The investigation also relied upon undercover police officers who also were propositioned to engage in sex acts, including hands-on lap dances, for a fee.

On May 3, 2002, VBT and Romulus police officers, in a cooperative effort, raided Legg's and an adjacent property pursuant to a valid search warrant. The search warrant was secured, in part, on Pomerico's statements.

At some point on May 3, 2002, VBT Director of Planning and Development Kelley was notified of the raid. He arrived at Legg's close to midnight after the warrants were served and while the police were still actively investigating. Kelley testified that he had never before appeared at a scene where the police were serving a warrant, but he appeared this time out of curiosity. He further testified that he walked through Legg's with his camera, which he always has with him.

Detective Louse Keele ("Keele"), who participated in the Legg's raid, testified that he may have informed Legg's customers and employees that a homicide was being investigated despite knowing that Cable's death had been classified by the coroner as "natural." However, the written reports regarding the Cable incident classify the "nature of the incident" and "offense" as "Prostitution/Wrongful Death" and "death investigation" respectively.

During the raid, VBT and Romulus police officers seized certain property as part of their ongoing investigation into criminal activity at Legg's. Included in the property seized was $1.6 million in cash removed from a safe located inside a residence adjacent to Legg's. Billy Martin, Hamilton's nephew, lived in the residence.

Following the raid, Legg's, along with various individuals whose property had been seized, filed a lawsuit in Wayne County Circuit Court against VBT, its police department, Officer Abdilla, the City of Romulus and Officer Ondejko. This case was captioned *Martin, et al., v Charter Township of Van Buren, et. al.*, No. 02-218416. The *Martin* plaintiffs alleged that the search warrant

was defective and was defectively executed, they alleged negligence and defamation, and they sought the return of property seized during the raid.

Ultimately the *Martin* plaintiffs were unsuccessful. On December 18, 2002, the trial court issued an order denying the return of the seized property and dismissing all claims against each of the *Martin* defendants. The *Martin* plaintiffs then filed a Claim of Appeal with the Michigan Court of Appeals, which was eventually dismissed by stipulation of the parties. Thus ended *Martin.*

**4.**

Soon after the raid, Abdilla, on behalf of VBT, contacted Ondejko, of the Romulus Police Department, to discuss a request made by VBT for assistance in the Legg's investigation. VBT requested the assistance because Romulus, unlike VBT, had a pre-existing special investigations unit ("SIU"). Ondejko, who is now retired, was a member of Romulus's SIU. Preliminary issues discussed between VBT and Romulus included recommendations regarding potential forfeiture of the seized money; the complexity of the investigation; and the time commitment, manpower and expense that would be incurred to effectively conduct the investigation.

On May 9, 2002, Romulus Police Chief Charles Kirby authorized Ondejko and other members of Romulus's SIU to assist VBT in the investigation of the Legg's matter. On May 15, 2002, the VBT and Romulus Police Departments entered into a written "equitable sharing" arrangement. The body of the agreement is as follows:

> On May 9, 2002, I met with your detectives at their request, to give assistance on their investigation into the case involving LEGG'S LOUNGE [sic]. (Case 02-2110). They informed me that there was approximately 1.6 million in cash seized from the residence of a bar manager and were looking for guidance on keeping the money.

We discussed the methods of investigation that would be needed to provide your Department with the best grounds for forfeiting this currency and the large potential for additional seizures if these methods were followed. I believe a racketeering and conspiracy investigation will provide that foundation. To conduct such an investigation will require the efforts of more than two detectives and the training, equipment and experience that our Department can afford you. At the conclusion of the meeting, you contacted Chief Kirby and my unit was given the permission to join your detectives in this endeavor. Chief Kirby and the City of Romulus only ask that we enter into an equitable sharing agreement. With your permission we would like to make the following request.

The City of Romulus will receive ten percent (10%) of the net proceeds derived from the forfeiture or other consent agreement in the settlement involving the approximately 1.6 million seized from 3918 Merriman in the City of Wayne, Mi. This percentage will be based on the amount left after prosecution costs are determined and will be in addition to actual cash expenditures by Romulus SIU on behalf of the Van Buren Township Police investigators. Receipts will be provided explaining those expenses.

Further, the City of Romulus will receive forty percent (40%) and Van Buren Township sixty percent (60%) of all proceeds from seizures that occur after our commitment to this joint investigation was made on May 9, 2002. This figure also will be based on net proceeds minus prosecution costs.

This letter agreement was written by Ondejko and addressed to Christopher Elg, the Director of VBT's Police Department. Ondejko testified that the Romulus Police Department would have assisted VBT absent the equitable sharing agreement, that equitable sharing agreements, such as this one, are common practice, and that Romulus had similar agreements with the State Police DRANO units and the DEA.

The defendants proffered Daniel J. Grant, an expert witness, who testified that equitable sharing agreements, such as this one, are common when multiple agencies are involved, and these agreements are authorized by both Michigan and federal statutes. On the other hand, the plaintiffs proffered Michael Levine ("Levine"), an expert witness, who testified that the contents of this equitable sharing agreement are "strongly evincive [sic] of a misuse of police power, authority and

force…." Levine also proffers that this agreement makes no mention of any apparent legal grounds for seizure, as a trained reviewer would expect, and, instead, "makes apparent that the money is the target of the law enforcement action and not it's [sic] natural bi-product." In any case, the parties agree that it is not unusual for law enforcement officers to share resources, including personnel, with neighboring municipalities.

On June 11, 2002, the Forfeiture Unit of the Wayne County Prosecutor's Office filed a forfeiture complaint in Wayne County Circuit Court seeking forfeiture of the property seized during the May 3, 2002 raid. This case was eventually dismissed with prejudice by stipulation of the parties and the money returned to Hamilton, minus $6,490 in costs.

**5.**

On August 6, 2002, the Wayne County Prosecutor's Office filed a complaint in Wayne County Circuit Court for abatement of nuisance, seeking to padlock Legg's. This case was dismissed with prejudice by the parties with the finding that the alleged nuisance activity had been abated.

**6.**

On August 16, 2002, misdemeanor complaints charging prostitution were issued against eleven (11) Legg's dancers, including Samantha Bates ("Bates"). On September 16, 2002, Bates filed a Complaint for Declaratory Judgment, Violation of Civil Rights, Permanent Injunction and attorney fees in the United States District Court for the Eastern District of Michigan, the same court from which this appeal is taken. Bates challenged VBT's Nudity On Licensed Premises Ordinance on various constitutional grounds, but lost when the court granted summary judgment in favor of VBT on *res judicata* grounds. On appeal, this Court affirmed the dismissal, *Bates v. Township of*

*Van Buren*, 459 F.3d 731 (6th Cir. 2006), and the Supreme Court denied Bates's petition for a writ of certiorari, 550 U.S. 935 (2007). Thus ended *Bates*.

**7.**

On November 3, 2003, the Michigan Attorney General's Office brought state-law RICO charges in the 34th Judicial District against Hamilton and others. On June 14, 2004, the trial court issued an order dismissing with prejudice the charges against Hamilton.

**B.      Procedural Background**

In plaintiffs' Corrected Fourth Amended Complaint ("CFAC")[1], the operative complaint, the plaintiffs assert four claims against the Romulus Defendants: (a) conspiracy; (b) First Amendment violations; (c) conspiracy to interfere with civil rights; and (d) tortious interference with a business expectancy. Plaintiffs assert the same four claims against the VBT Defendants plus claims for conversion and "taking." Plaintiffs assert six claims against the Inkster Defendants: (a) conspiracy; (b) First Amendment violations; (c) conspiracy to interfere with civil rights; (d) conversion; (e) "taking;" and (f) larceny.

The VBT, Romulus and Inkster Defendants each filed motions for summary judgment. The district court denied oral argument and decided the matter on the briefs. The district court, in two separate opinions, dismissed the claims against all of the defendants.

The first opinion was entered on August 18, 2009, and granted summary judgment to the Romulus and VBT Defendants. The district court determined that the individual plaintiffs and the

---

[1]The Corrected Fourth Amended Complaint includes the City of Southgate, Southgate Mayor Susan Hall and Officers Lawrence Hall and Lawrence Lokuta as defendants. These defendants were subsequently dismissed pursuant to a stipulation. (Case No. 01-CV-74698, doc. #326.)

trust lack standing to assert a conspiracy claim or any other claim to redress injuries to the corporate entities. It then dismissed the First Amendment claims brought by the individuals, finding that their right to associate was not violated by any of the remaining defendants. The individual plaintiffs were not dismissed entirely at the time because their First Amendment claims against the Inkster Defendants had not yet been addressed.

The district court then granted summary judgment for the Romulus and VBT Defendants on the conspiracy claim because the plaintiffs offered no evidence of an agreement between Romulus and VBT to engage in unlawful action. In doing so, the district court found that the equitable sharing agreement is not an illegal agreement and that the plaintiffs did not establish any cognizable damages arising from the seizure of property sufficient to sustain a conspiracy claim.

The district court next found that plaintiffs' conspiracy-to-violate-civil-rights claims against the Romulus and VBT Defendants failed because plaintiffs offered no evidence of any conspiracy involving the Romulus and VBT Defendants "to influence parties, witnesses, or jurors in federal court proceedings" or to impede, hinder, obstruct or defeat "the due course of justice." The district court also found that plaintiffs presented no evidence that the Romulus and VBT Defendants' actions were motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus."

The district court next found that plaintiffs' tortious-interference-with-business-relationship claims against the Romulus and VBT Defendants failed because the plaintiffs did not satisfy at least one of the elements of a Michigan tortious-interference-with-business-relationship claim. Specifically, the claims failed because the incident causing the alleged interference, the May 3, 2002

raid at Legg's, was conducted pursuant to a lawful search warrant and thus was not a wrongful act or an act done with malice and unjustified in law.

The district court next found that plaintiffs' conversion claim against the VBT Defendants failed. The conversion claim failed because the May 3, 2002, raid was conducted pursuant to a valid search warrant and the property was lawfully seized.

Finally, the district court found that plaintiffs' "taking" claim against the VBT Defendants failed because the alleged unconstitutional ordinance had been declared to be constitutional and because the raid on Legg's and the associated seizure of property was lawful. The district court found that the "taking" claim appeared to be nothing more than the conversion claim recast.

The second opinion was entered on August 26, 2009, and granted summary judgment to the Inkster Defendants. The district court first dismissed the First Amendment claims brought by the individual plaintiffs because the individual plaintiffs claimed that their right to associate was violated by the MLCC and not by any of the other defendants who remained a party to the action.

The district court then granted summary judgment for the Inkster Defendants on the conspiracy claim because the plaintiffs failed to present any evidence of monetary or non-monetary damages that resulted from the alleged overt act, the bomb threat. The district court also granted summary judgment on the conspiracy-to-interfere-with-civil-rights claim because the plaintiffs presented no evidence thereof.

The district court next granted summary judgment on the conversion and "taking" claims. Summary judgment was granted on the conversion claim against Officer Abdullah because the record contains no evidence that Abdullah handled the video tape that is the subject of the conversion claim. This claim also failed against Officers Martin and Brown because plaintiffs did

-12-

not establish any damages due to the alleged illegal conspiracy. Summary judgment was granted on the "taking" claim because the plaintiffs discussed the conversion and "taking" claims as if they were one claim and did not discuss the "taking" claim separately.

Finally, plaintiffs' larceny claim against the Inkster Defendants was dismissed because larceny is a crime and not a private cause of action. The Plaintiffs/Appellants have now appealed the grants of summary judgment to the Romulus, VBT and Inkster Defendants. The Plaintiffs/Appellants do not appeal the district court's ruling that the individual plaintiffs may not assert claims on behalf of the corporate defendants. Plaintiffs/Appellants also do not appeal the dismissal of their 42 U.S.C. § 1985(2) claims, their conversion claims, their "taking" claims or their larceny claims.

## II. JURISDICTION

This Court has jurisdiction to consider this appeal pursuant to 28 U.S.C. § 1291. Section 1291 provides for jurisdiction over appeals from all final decisions of district courts, and the decisions being appealed are final decisions of a district court. Finally, this appeal was timely filed pursuant to FRAP 4(a)(1)(A).

## III. STANDARD OF REVIEW AND BURDEN OF PROOF

Plaintiffs/Appellants appeal the two orders granting summary judgment to the Romulus, VBT and Inkster Defendants. Thus, the standard of review is de novo. *See Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law. Fed. R. Civ. P. 56(c). The court must view the evidence in a light most favorable to the non-moving party, the Plaintiffs/Appellants in this case, and draw all reasonable inferences in the non-moving party's favor. *Id.* To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

An issue of fact is genuine only if it is based upon evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 451 (6th Cir. 2004). For a fact to be material, it must affect the outcome of the suit. *Smith v. Chrysler Corp.*,155 F.3d 799, 804 (6th Cir. 1998)(citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). Finally, factual disputes that are irrelevant or unnecessary will not be considered. *Id.*

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Hedrick*, 355 F.3d at 451. Once the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing a triable issue. *Id.* at 452. The proper inquiry on an appeal from a grant of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury. *Williams v. Ford Motor Co.*,187 F.3d 533, (6th Cir. 1999)(citing *Anderson*, 477 U.S. at 251-52 (1986)).

## IV. DISCUSSION

The Appellants identify eight (8) "Issues Presented for Review" in their Appellants' Brief. However, the Brief discusses seven (7) different, but related issues. The seven (7) issues that are fully discussed in the Appellants' Brief will be addressed herein instead of the eight (8) "Issues Presented for Review."

**1. The Trial Court ignored evidence of individual and municipal liability under 42 U.S.C. § 1983**

Appellants allege that the individual and municipal Appellees, with the exception of Inkster, violated their federal rights. The Appellants again point to evidence that they originally identified, that they say creates genuine issues of material fact as to the individual liability of Kelley, Abdilla, Ondejko, Martin, Brown and Abdullah and the municipal liability of VBT and Romulus.

Section 1983 prohibits officials acting under color of law from depriving citizens of "any rights, privileges, or immunities secured by the Constitution." *McDonald v. City of Chicago, Ill.*, 130 S. Ct. 3020, 3076 (2010). Rather than identify the specific rights, privileges or immunities that were allegedly violated, other than the right of association, the Appellants argue that the trial Court gave no consideration to all possible avenues for § 1983 liability and decided only whether the Appellees abridged Appellants' right of association. Thus, the Appellants have failed to preserve any violation of specific constitutional rights.[2] As a result, we will only consider the issue of whether Appellants violated the Appellee's right of association.

Regarding the right of association, Appellee's CFAC alleges that the Appellants have sought to: deprive Hamilton, J.R. Hamilton, Jeremy Hamilton and Michael Hamilton of their rights of ownership of business; to interfere with the family relationship and the right of association; and to inhibit their right of free speech in violation of § 1983. (CFAC ¶¶ 227, 267 and 302.) The CFAC also alleges that Hamilton and his corporations have been denied equal protection. (CFAC ¶¶ 229, 269, 304.) Finally, the CFAC alleges that the Appellants retaliated against them for their exercise of their First Amendment rights. (CFAC ¶¶ 228, 268 and 303.)

---

[2]Federal Rule of Appellate Procedure 28(a) requires that an appellant's brief include a statement of the issues presented for review and argument on each issue presented. FRAP 28(a).

According to the Appellants, as a result of the harassment of the police, the MLCC barred John Hamilton from working with his children. Appellants argue that this restriction is "unconstitutional on its face." The Appellants also argue that the trial court's holding that these claims were barred because the only proper party Defendant was the MLCC, which is not a party, "is error." However, the Appellants offer no facts or legal argument as to how Hamilton was illegally barred from working with his children.

The trial court dismissed the First Amendment claims because the individual plaintiffs did not assert that their right to associate was violated by any current defendant. Further, the Appellants offer no facts or legal argument as to why the trial court's holding regarding MLCC is in error. Without more, there is nothing for this Court to review. There are no genuine issues of material fact and the Appellees are entitled to judgment as a matter of law on Appellants' right-of-association claim. The trial court's decision on the right-of-association matter is affirmed.

The only other possible avenue for § 1983 liability mentioned in the Appellants' Brief is "retaliation taken against the Appellants for engaging in 1st amendment expression." However, the Appellants offer no argument regarding this alleged § 1983 liability. Thus, alleged § 1983 liability for retaliation for engaging in First Amendment expression was not appealed. If it were, it would be without merit.

Retaliation for exercise of First Amendment rights is a violation of § 1983. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006). The arguable "facts" identified by the Appellants for their conspiracy claim are more fully set forth below and are the same and only facts that could be identified as the basis for a § 1983 retaliation claim. As with the conspiracy claim, this plethora of arguable facts suffer from a multitude of problems, including that they misstate the underlying

evidence, are presented only to prejudice this Court, are irrelevant, do not describe illegal activity, do not constitute evidence, are actions not taken under the "color" of the law or are legal conclusions unsupported by factual allegations. Thus, based upon these alleged facts, no reasonable juror could find that the Appellees retaliated against the Appellants based upon the Appellants' exercise of First Amendment rights.

There are no genuine issues of material fact and the Appellees are entitled to judgment as a matter of law on Appellant's right-of-association claim. Further, if the Appellants had appealed a retaliation claim, there would be no genuine issues of material fact and the Appellees would be entitled to judgment as a matter of law on that claim.

Therefore, Appellants' first assignment of error is not well taken. The trial court did not ignore evidence of individual and municipal liability under 42 U.S.C. § 1983.

**2. There is evidence from which a reasonable juror could have found both a § 1983 conspiracy and state-law conspiracy by the Appellees.**

**3. The Trial Court erred when it redefined and narrowed the nature of the conspiracy alleged by the Appellants.**

**4. The Trial Court erred when it refused to consider the evidence of the acts of non-Defendant co-conspirators.**

**5. The Trial Court erred when it misapplied the law relative to conspiracy.**

Each of the above four assignments of error go to summary judgment on the conspiracy claim. The trial court granted summary judgment to the VBT, Romulus and Inkster Defendants on the conspiracy claim. Therefore the above four assignments of error will be considered together.

Appellants' CFAC merely alleges counts brought under the "conspiracy and continuing wrongful acts doctrine." The CFAC does not identify the specific legal basis for the conspiracy claim.

Further, the Appellants now argue that the "corporate Appellants" allege that VBT, Romulus, and Inkster engaged in a variety of acts designed to put Hamilton's bars out of business. Thus, the Plaintiffs/Appellants do not now appeal the grant of summary judgment regarding the individual plaintiffs' conspiracy claims.

A civil conspiracy actionable under § 1983 is

[a]n agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). Further, conspiracy claims must be pled with some degree of specificity, and vague and conclusory allegations unsupported by material facts are not sufficient to state a claim. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003)(citing *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)). Finally, circumstantial evidence of an agreement among all conspirators may provide adequate proof of a conspiracy. *Id.*(citing *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)).

As to damages, a conspirator is liable for all of the acts taken in furtherance of the conspiracy, regardless of whether the conspirator participated directly in the act. *Canter v. Hardy*, 188 F. Supp.2d 773, 792 (E.D. Mich. 2002). Also, a settlement with a named co-conspirator is not a bar to introducing evidence of the settling defendant's conspiratorial acts. *Id.* at 776.

-18-

Michigan conspiracy law is similar to federal conspiracy law. Michigan conspiracy law provides that "[a] conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means." *Fenestra Inc. v. Gulf America Land Corp.*, 141 N.W.2d 36, 48 (Mich. 1966). Thus, if applicable, the unlawful means must have been used to accomplish a criminal or unlawful purpose.

The Appellants first argue that the Appellees conspired to put Hamilton's bars out of business. They identify the following plethora of purported factual allegations in support of their conspiracy claim:

1. Southgate police officer Lawrence Lokuta ("Lokuta") (a non party) conducted three actions against Henry's South and used these to file MLCC violations in an effort to close Henry's South.

2. Within three months of these charges being settled, Lokuta again conducted undercover operations against Henry's South and waited six months before filing MLCC violations allegedly to ensure that the dancers would not be available to testify and contradict his allegations. As a result of these violations, Henry's South's liquor license was revoked.

3. The MLCC then settled with Henry's South allowing the business to be sold and transferred but Southgate would not approve the transfer of an entertainment permit to allow topless dancing.

4. Between 1991 and 2001, Southgate police traveled through Henry's South's parking lot several times a day and evening and would park across the street in plain view of the customers. These police officers allegedly "unjustifiably" interrogated the bar's employees and stopped and followed patrons leaving the bar, allegedly without justification.

5. During some of this time, Laurence Hall was the Southgate Police Chief and was married to Susan Hall when she was the Mayor of Southgate between 1999 and 2003. In 2003, Susan Hall was videotaped at a Southgate City Council meeting stating, "we've been working for eight years to get Hamilton out of here."

-19-

6. On May 10, 2000, Southgate passed an "anti-nudity"ordinance allegedly directed at Henry's South.

7. After Henry's South lost its liquor license, the Southgate police administration on October 2, 2002, directed that the anti-nudity ordinance be enforced only against non-liquor-licensed establishments, specifically stating that enforcement of the ordinance with regard to topless dancing is only appropriate against Henry's South.

8. On May 7, 2002, four days after VBT had raided Legg's, VBT officer Abdilla contacted Detective Walsh of the Southgate police to discuss his investigation of Henry's South.

9. Henry's South sued Southgate, and, in 2006, the anti-nudity ordinance was found unconstitutional.

10. Prior to 1991, at an MLCC hearing regarding Henry's in Inkster, an MLCC attorney instructed one of Hamilton's witnesses to evade a subpoena.

11. Subsequently, the MLCC filed charges against Henry's South. Woody Webb, an MLCC enforcement officer, told Hamilton that he had been instructed to show Hamilton "who's the boss" and not to settle the charges against Henry's South even though it was a first offense.

12. Assistant Attorney General Thomas Giachino, assigned to the MLCC, testified that he could not recall other establishments who had engaged in lap dancing having their liquor license revoked and could not recall any other license revocation in 1994 and that such revocations are rare.

13. On April 2, 1996, Wayne County Assistant Prosecutor Larry Roberts sent a memo to Inkster police asking for information on Hamilton's two topless bars in Inkster and said that the MLCC would cooperate in prosecuting these establishments.

14. On September 7, 2007, a federal court found that the MLCC rules that were used as the basis of the revocation of Henry's South's license could not be enforced until the underlying legal proceeding was resolved.

15. Soon thereafter, a Wayne County Task Force conducted an undercover operation at Bogart's. The same Task Force, this time with Inkster police officer Martin and VBT police officer Gregory Laurain, then conducted an undercover operation against Henry's South.

16. On May 3, 2002, VBT executed two search warrants outside its jurisdiction in a residence in Wayne, Michigan, resulting in the seizure of a safe containing in excess of 1.6 million dollars of Hamilton's money.

17. On May 7, 2002, Abdilla contacted Southgate Police to discuss his investigation of Henry's South.

18. On May 17, 2002, VBT and Romulus police officers executed a search warrant at Henry's.

19. On May 21, 2002, Ondejko used a confidential informant to conduct an undercover operation at Bogart's.

20. On May 26, 2002, a Romulus police officer conducted an undercover operation against Bogart's.

21. On June 21, 2002, Romulus police officers, working with VBT, again conducted an undercover operation at Bogart's.

22. The Appellants assert that the trial court "summarily dismissed Levine's 429 page report detailing the conspiracy as 'highly subjective and argumentative.'" Levine, Appellants' expert, is alleged to have reviewed over 20,000 pages of Appellants' exhibits and depositions and many hours of videotaped interviews.

23. VBT clearly did not want a topless bar in its community and drafted SOB ordinances that were directed at and only enforced against Legg's.

24. When a lawsuit failed to close Legg's, VBT tried to close Legg's through an extensive and unwarranted criminal investigation.

25. Kelley was present at the May 3, 2002, search for no legitimate reason.

26. The report of the criminal investigation submitted by VBT and Romulus investigators was false and based upon perjured testimony and substandard investigative procedures.

27. VBT and Romulus had contacts with Southgate and Inkster and conducted numerous investigations and searches outside of their jurisdiction.

28. According to another Plaintiffs'/Appellants' expert, the passing of the VBT SOB ordinances and the intensive criminal investigation caused a dramatic loss of sales at Legg's. Additionally, Henry's South had more than 3.2 million dollars in losses.

29. Hamilton testified that he experienced the distress of a sham criminal prosecution, the seizure and holding of $1.6 million, police harassment and perjury, the blocking of the sale of Henry's South, and "millions of dollars in lost sales."

30. The trial court has previously engaged in this type of reversible error.

31. There was inadequate supervision of Abdilla and Ondejko, the two lead investigators leading, to giving informants money to have sex with dancers and for Abdilla and Ondejko themselves to go into the businesses and engage in sexual activity.

32. VBT officers had been at Legg's more than 119 times while they were off duty drinking for free and engaging in illegal sexual activity.

33. It can be inferred that the bomb threat on May 11, 2000, was perpetrated by Brown, Martin and Abdullah in order to seize a video tape of the dancers.

34. The Joint Investigation Agreement [equitable sharing arrangement agreement] was entered into with an unlawful purpose.

**Analysis**

There are many problems with the above plethora of factual allegations identified by the Appellants, not the least of which is that there is no evidence of an agreement between anyone to engage in an unlawful action or to engage in a lawful action for an unlawful purpose. What Appellants lack in quality, they attempt to make up in quantity. Yet, at best, the Appellants have shown that various government entitles worked together to investigate criminal activity, a perfectly legal and accepted practice. At worst, the Appellants have shown that some of the individuals and police procedures involved may not have been perfect, but not illegal.

Many of the Appellants' allegations misstate the underlying evidence are presented only to prejudice this Court; are irrelevant, do not describe illegal activity, do not evidence an illegal purpose, were not actions taken under the "color" of the law, are legal conclusions unsupported by factual allegations or are a combination of the foregoing.

By way of further example, much is made of the equitable sharing agreement and Appellants' Expert's view of the equitable sharing agreement. Yet, expert testimony is not needed to decide the legality of the equitable sharing agreement. The equitable sharing agreement is an often-used type of agreement, is not illegal, and makes no mention of putting Hamilton out of business. Further, the fact that an equitable sharing agreement may result in criminal charges does not render the agreement unlawful.

Appellants' expert report is, at best, speculative and conclusory. The expert report cannot be used to create an issue of fact where none existed. *See Williams*, 187 F.3d at 544.

Appellants argue that the trial court erred when it narrowed the object of the conspiracy claim in the case of the VBT and Romulus Defendants to consideration of only the equitable sharing agreement. The Appellants also argue that the trial court erred in its definition of wrongful acts by framing the issue as what damages flowed from the seizure of property in the case of the VBT and Romulus Defendants and what damages flowed from the bomb scare incident in the case of the Inkster Defendants. Finally, the Appellants argue that the trial court erred when it refused to consider the acts of the MLCC and Southgate. All of these arguments fail because the Appellants have not shown any agreement to engage in unlawful conduct.

The Appellants also argue that the court should have considered whether the co-conspirators used arguably lawful means for the improper purpose of putting Appellants' bars out of business. In this case, while it may be against the law to put Appellants' bars out of business using illegal means, it is not against the law if Appellants' bars are forced out of business for failing to comply with the law, and Appellants have not shown that the co-conspirators failed to comply with the law.

The above facts and the additional facts identified upon de novo review, even if accepted as true, do not identify any illegal activity or any legal activity taken with an illegal purpose, a requirement to sustain a conspiracy claim under either federal or Michigan conspiracy law. This conclusion is supported by the individual Appellants who all testified that they did not have any personal knowledge that any of the Defendants were trying to put them out of business.

The factual allegations identified by the Appellants do not identify a sufficient disagreement on the elements of a conspiracy claim to require submission to a jury. There are no genuine issues of material fact and the VBT, Romulus and Inkster Defendants are entitled to summary judgment on the corporate Appellants' conspiracy claim. The trial court's decision on the conspiracy claim is therefore affirmed.

**6. The Trial Court erred when it redefined and narrowed the claim relative to tortious interference with business relations.**

The Appellants argue that the trial court erred when it narrowed the tortious-interference claim to consideration of only the raid of Legg's and failed to consider the other factual allegations regarding their § 1983 claims for attempting to put Hamilton's bars out of business. However, this Court has considered Plaintiffs'/Appellants' § 1983 conspiracy, right-of-association and retaliation claims above and found that the Appellees are entitled to summary judgment on each.

Under Michigan law, the Plaintiffs/Appellants must show the following elements to prevail on a tortious-interference-with-a-business-relationship claim:

> (1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disputed.

*Wausau Underwriters Insurance Co. v. Vulcan Development, Inc.*, 323 F.3d 396, 404 (6th Cir. 2003). Further, showing an intentional interference requires showing purposeful or knowing behavior and that the interference was either (1) a per se wrongful act or (2) a lawful act done "with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Id.*(quoting *Feldman v. Green*, 360 N.W.2d 881, 891 (Mich. Ct. App. 1984)). Finally, to show that a lawful act was done with malice and without justification, the plaintiff must show, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference. *Erickson's Flooring & Supply Co., Inc., v. Tembec, Inc.*, 212 F. App'x 558, 566 (6th Cir. 2007)(unpublished).

The Appellants argue that the acts of the Appellees constituting § 1983 violations likewise state a claim for tortious interference. However, summary judgment has been granted to these Appellees on the alleged § 1983 violations. Thus, the Plaintiffs/Appellants have not shown the VBT, Romulus or Inkster Defendants either committed a per se wrongful act or a lawful act done with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.

There are no genuine issues of material fact and the VBT, Romulus and Inkster Defendants are entitled to judgment as a matter of law on Appellants' tortious-interference-with-business-relationship claim. The trial court's decision on this claim is therefore affirmed.

**7. The Trial Court erred in disregarding evidence on the basis that Appellants at deposition could not remember all the facts supporting their claims.**

The Appellants' final argument is that the trial court did not consider evidence for purposes of the motions for summary judgment beyond Hamilton's lack of knowledge of the facts supporting

-25-

his claims. Rule 56(c) requires the court to consider the pleadings, the discovery and disclosure materials, and any affidavits on file. Fed. R. Civ. P. 56(c). Thus, when considering a motion for summary judgment, a court should consider more than only one deposition if more Rule 56 evidence than one deposition is filed, as is the case here.

In this case, there is evidence, based upon a reading of the opinions, that the trial court examined the three motions for summary judgment, the responses and the replies, including the pleadings, discovery, and disclosure materials and affidavits on file. In reaching its summary judgment decisions, the trial court cites ample evidence in addition to the individual Appellants' deposition testimony. Therefore, the trial court did not err in disregarding evidence that the individual Appellants could not remember all the facts supporting their claims at deposition.

## IV.    CONCLUSION

The trial court did not ignore evidence of individual and municipal liability under 42 U.S.C. § 1983. The Appellees are thus entitled to summary judgment on these claims.

The trial court did not misapply conspiracy law and there is no evidence from which a reasonable juror could have found a § 1983 conspiracy or a state-law conspiracy by the Appellees. Thus, the Appellees are entitled to summary judgment on Appellant's conspiracy claims.

Appellants' tortious interference with business relations claim fails. Appellees are thus entitled to summary judgment on this claim as well.

Finally, the Appellants' statements and the evidence that is identified in addition to the Appellants' statements were considered by the trial court and do not support the Appellants' claims. The judgment of the district court is therefore **AFFIRMED**.